**Grace KOPOIAN, Jerry Mee and Harry D. Callicotte, Respondents,**

v.

**GEORGE W. MILLER & COMPANY, INC., Appellant.**

**No. WD 47800.**

Missouri Court of Appeals, Western District.

March 14, 1995.

As Modified May 30, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 30, 1995.

Application to Transfer Denied July 25, 1995.

**64**

Jeffrey A. Burns, Kansas City, for appellant.

Ronald J. Stites, Kansas City, for respondents.

Before SMART, P.J., and KENNEDY and ULRICH, JJ.

SMART, Presiding Judge.

This appeal of a negligence action arose out of a robbery and assault which left three people badly injured in the early morning hours of December 7, 1986. Defendant George W. Miller & Co., the owner of townhouse apartments in Kansas City, appeals a verdict in favor of tenants for breach of a landlord's duty to provide security against criminal assaults. The case involves the issue of whether Missouri has abrogated the rule that landlords generally have no duty to provide tenants with security against criminal acts in the absence of "special circumstances" giving rise to that duty. Defendant contends on appeal that plaintiffs failed to make a submissible case of liability. Judgment reversed.

Defendant George W. Miller & Co., Inc. ("Miller") owns some townhouse duplexes in mid-town Kansas City. At the time of the assault in question, Plaintiff Grace Kopoian resided in one of Miller's duplexes at 4505 Washington. Her son, H.D. Callicotte, and her friend, Jerry Mee, resided with her. At about 1:30 a.m. on December 7, 1986, Callicotte, a law student, returned home from a late night of studying for examinations.

It was raining as Mr. Callicotte parked his car on the street near the townhouse. Mr. Callicotte then hurried in the rain to the porch of his townhouse, carrying his books. He opened the screen door with his left hand and propped the screen door against his right shoulder while unlocking the townhouse door with his right hand. As he unlocked the door, Mr. Callicotte received a sudden and forceful blow to the back of the head.

The attacker, Harold Releford, had been completely unseen until a split-second before the blow to the head, when Mr. Callicotte had caught a "flash" of movement in his peripheral vision, almost simultaneous with the blow to the head. Upon being struck, Callicotte crumpled against the door he was just unlocking. The weight of his body pushed it open, and he fell into the front hallway of the townhouse. Releford, armed with a baseball bat (with which he had delivered the first blow), stepped into the townhouse and continued the attack. Mr. Callicotte put up his arms to protect himself, and was hit again, the blows breaking his arms. Mr. Callicotte's mother and Jerry Mee were in the living room adjacent to the area of the on-going assault. As Ms. Kopoian and Mr. Mee came to the aid of Mr. Callicotte, Releford jumped over Mr. Callicotte and began to strike Ms. Kopoian and Mr. Mee with the baseball bat. While Releford was assaulting Kopoian and Mee, Callicotte crawled to a piece of furniture and grabbed a cushion. Callicotte charged back at Releford, trying to hold the cushion as protection, and hoping to get his hands on Releford's neck. Releford pushed Callicotte off and hit him again with the bat, knocking him down again, and struck him additional times. Releford then turned Callicotte over, took his wallet and left the apartment. Releford was later apprehended and convicted.[1]

The assault at 4505 Washington shared some characteristics with a similar incident which occurred earlier the same night in another area of town. In that case, a family named Breeding had returned home from an outing and pulled in their driveway. Mr. Breeding went to the porch to unlock the door so that he could then return to the car and help bring in the young children, who were sleeping. While Mr. Breeding was on his well-lighted porch, Releford came running across the property with his baseball bat poised for attack. Mrs. Breeding observed Releford and screamed to her husband, alerting him to Releford's impending attack. Mr. Breeding turned and dived at Releford. Although Breeding was larger than Releford, Releford prevailed. Breeding said that rather than try to run from Releford and risk getting hit from behind with the fat part of the bat, he tried to just keep "going at" Releford to try to knock the bat out of his hands. He was hit several times in the arms and hands. Releford then hit him solidly in the head, knocking him unconscious. Releford rolled the victim over, extracted his wallet, and ran away. About an hour later, Releford perpetrated the attack at Ms. Kopoian's residence.

In this case, Kopoian, Mee and Callicotte sued the Defendant Miller, their landlord, on a theory of premises liability. Plaintiffs submitted their case on three allegedly dangerous conditions in the premises: a defective porch light, a shrub on the north side of the porch that allegedly had been allowed to grow too tall, and the absence of a deadbolt lock on the door to the townhouse.[2] Plaintiffs contended that Miller retained control over the porch light, the shrub, and the installation of door locks. The conditions alleged, argued plaintiffs, were dangerous in that they created a reasonably foreseeable risk of danger of criminal assault, and were a joint and concurring cause, along with Releford's actions, of plaintiffs' injuries. The theories related to the bush and the light were that their condition may have prevented Callicotte from seeing Releford as the attacker approached, and that they therefore may have denied Callicotte an opportunity to overcome Releford. The theory related to the lock was that if the door had been fitted with a deadbolt lock it would have taken Callicotte longer to get the door unlocked, with the result that the attack would have occurred only on the porch and would not have moved to the interior of the apartment. This, they say, would have protected Mr.

---

1. Releford was sentenced to consecutive terms of punishment totaling 155 years. *State v. Releford,* 750 S.W.2d 539 (Mo.App.1988).

2. According to the briefs, plaintiffs' verdict director was MAI 22.05, modified. MAI 22.05 is the instruction used when a tenant is injured on common premises due to a physical defect in the premises. No Missouri case has directly addressed whether this instruction is appropriate for cases such as this, where the alleged defect is not dangerous in itself.

Mee and Ms. Kopoian, although it would have made no difference as to Callicotte.

Mr. Mee, a victim of very serious injuries, took his own life while the case was pending. Ms. Kopoian was named personal representative for Mr. Mee, and she was substituted as the named plaintiff for Mr. Mee on April 23, 1991. The case was tried in February, 1993. At the conclusion of jury deliberations, the jurors found in favor of each plaintiff and awarded Ms. Kopoian $150,000.00 in damages, the estate of Jerry Mee $400,000.00 in damages, and Mr. Callicotte $75,000.00. Defendant's motion for judgment notwithstanding the verdict was denied. Defendant did not file a motion for new trial. This appeal follows.

Defendant raises several issues on appeal. First, defendant contends that the court erred in failing to direct a verdict for the defendant for the reason that no evidence was introduced which could give rise to a duty on the part of defendant to protect plaintiffs from the random criminal attacks of a person such as Releford. Defendant also complains that plaintiffs failed to show that the conditions complained of were causally related to the injuries sustained by plaintiffs.[3] We have concerns about both causation and duty in this case, but because duty is the more fundamental issue, for the court we devote our analysis to that issue.

### Duty to Provide Security

The verdict directing instruction submitted to the jury the issue of whether, by virtue of the state of the bush near the front door (taller than two feet) and of the porch light (defective) and of the door (lacking a deadbolt), the premises were not reasonably safe. Thus, the jury was asked to decide whether a legal duty existed by judging whether the premises were "reasonably safe."

Traditionally, landlords have been under no duty to provide security for tenants from the criminal activities of third persons. An exception to this rule exists, however, in the case where a duty has been found to have arisen from particular circumstances, such as the landlord's knowledge of previous violent crimes on the landlord's premises. *Advance Rental Centers, Inc. v. Brown,* 729 S.W.2d 644 (Mo.App.1987). Other special circumstances giving rise to a duty may consist of those that exist when the misfeasance of the landlord creates a circumstance of extraordinary danger or enhances the risk of the tenant's victimization beyond the risk of crime victimization generally. Annotation, Private Person's Duty and Liability for Failure to Protect Another Against Criminal Attack by Third Person, 10 A.L.R.3d 619 (1966). It is held that outside of special circumstances, there is no duty to provide security guards, bars on windows, or exterior lighting, as a precaution against crime. *Id.* A study of the landlord's duty to light common areas, for instance, reveals that historically, the landlord has had no general duty to illuminate common areas. *Weinel v. Hesse,* 174 S.W.2d 903 (Mo.App.1943). A duty to illuminate common areas may arise out of the fact that illumination is necessary to prevent injury where there is a physical defect in the premises, such as a broken step. *Lambert v. Jones,* 339 Mo. 677, 98 S.W.2d 752 (1936). It has also been held that, where a landlord voluntarily assumes a duty of providing lighting in common areas, the duty must be performed with reasonable care. *Sherman v. Bobrecker,* 322 S.W.2d 898 (Mo.1959) (landlord liable when tenant fell over child's bicycle in dark lobby of building). These cases have not, however, previously been applied to the prevention of crime. Generally, the courts have declined to hold that a landlord has a general duty to illuminate common areas for security purposes. *See, e.g., Stanley v. Town Square Coop.,* 203 Mich.App. 143, 512 N.W.2d 51 (1993) (association not liable for injuries to visitor assaulted in poorly lit, unfenced parking lot); *Bartley v. Sweetser,* 319 Ark. 117, 890 S.W.2d 250 (1994) (landlord not liable to tenant raped in apartment who contended landlord failed to pro-

---

**3.** Defendant also contends that the estate of Jerry Mee failed to make a submissible case under the survivorship statute, § 537.020, RSMo 1986, in that plaintiff's pleadings and proof tended to show that Mr. Mee's death resulted from the severity of his injuries, making it a wrongful death case rather than a survivorship case. Because of our disposition of this case on other grounds, we need not reach the survivorship issue.

vide adequate security and adequate lighting of common areas, and failed to warn her of risk of criminal activity.) However, some courts have found liability where lack of lighting was one of several factors contributing to the likelihood of occurrence of a criminal assault in a circumstance where the landlord's negligence enhanced the vulnerability of tenants or where the landlord had special reason to foresee the likelihood of particular criminal activities on the premises. *E.g., Frances T. v. Village Green Owners Ass'n.*, 42 Cal.3d 490, 723 P.2d 573, 229 Cal.Rptr. 456 (1986).

The plaintiffs' position in this case, reduced to its essence, is that the landlord's duty to provide security in a given case can be whatever the jury reasonably decides it should be, based upon evidence that the area under the landlord's control is not reasonably safe. Plaintiffs argue, in effect, that under present Missouri law, it is possible for a tenant victimized by crime to plead a cause of action by pleading that his injuries were caused or contributed to by the fact that something under the landlord's control was an unsafe condition. The landlord's negligence could consist of the failure to put bars on the windows, the failure to install an electric alarm system, the failure to provide a security guard, or the failure to promptly replace a burned-out bulb on the porch light. Liability may be found, they argue, as long as it appears in retrospect that such conditions were not reasonably safe. The plaintiffs tried this case as though one may make a submissible case against a landlord by presenting the testimony of a security consultant setting forth the view that some security feature likely would have had some impact in deterring or avoiding a criminal assault, and that the landlord should reasonably have provided this security feature. This approach assumes a special relationship between landlord and tenant based merely on the landlord-tenant status, as though there is something inherent in the relationship which requires that the landlord take general responsibility for security.

Some courts have been willing, in fact, to go this direction, imposing a generalized duty to provide security on landlords. *E.g., Trentacost v. Brussel*, 82 N.J. 214, 412 A.2d 436 (1980) (adopting view that the landlord's implied warranty of habitability obligates the landlord to furnish "reasonable safeguards" for the protection of tenants from criminal activity); *Kline v. 1500 Massachusetts Avenue Apartment Corp.*, 439 F.2d 477, 485 (D.C.Cir.1970) (treating a landlord as obligated "to provide those protective measures which are within his reasonable capacity"). The practical effect of adopting the notion that the landlord has a general duty to provide security is to make the issue of duty a jury issue rather than an issue of law for the court. Plaintiffs, accordingly, desire that the court treat the issue of duty as an issue of fact for the jury.[4]

■ In Missouri, however, a landlord's duty of security to a tenant remains a matter of law. *Aaron v. Havens*, 758 S.W.2d 446, 447 (Mo. banc 1988); *Advance Rental Centers, Inc. v. Brown*, 729 S.W.2d 644, 646 (Mo.App.1987) ("In the final analysis the matter [of duty] is one of policy"; citing *Meadows v. Friedman R. Salvage Warehouse*, 655 S.W.2d 718, 721 (Mo.App.1983)). Other courts also find the issue of duty to be a matter of law. *E.g., Bartley v. Sweetser*, 319 Ark. 117, 890 S.W.2d 250 (1994); *Spitzak v. Hylands, Ltd.*, 500 N.W.2d 154, 156 (Minn. App.1993); *C.S. v. Sophir*, 220 Neb. 51, 368 N.W.2d 444 (1985); *Walls v. Oxford Management Co.*, 137 N.H. 653, 633 A.2d 103, 104 (1993); *Whittaker v. Saraceno*, 418 Mass. 196, 635 N.E.2d 1185, 1187 (1994). "[Duty] is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court." W. Page Keeton, Prosser and Keeton on Torts 236 (5th ed. 1984).

■ An analysis of the issue of duty begins with an examination of the source of the duty. We could look first to the question of

---

**4.** In this case, plaintiffs approached the issue of duty as one for the jury to decide based on the evidence. The evidence presented included testimony from expert witnesses as to the usual

"standard of care" of landlords as though this were a professional negligence case where the duty is established by the degree of skill exercised by members of the profession generally.

whether or not any duty is imposed by statute. For instance, in *Gaines v. Property Servicing Co.*, 276 S.W.2d 169 (Mo.1955), the landlord was under a statutory duty to provide a fire escape. A third floor tenant was injured when he jumped from a window to escape from a fire which had been set by an arsonist. The landlord had a statutory duty, for safety reasons, to provide a fire escape for the benefit of tenants. The landlord was held liable, even though the fire was caused by the intentional criminal act of a third party. The criminal's actions were not seen as intervening because the threat of arson was one of the very risks contemplated by the statute. See Restatement (Second) of Torts, § 448 (1977).

■ In cases where there is no statutory duty imposed with regard to the particular allegation of dangerous condition, we must look to the case law to see if the law has recognized a duty. This brings us to the decision of the Missouri Supreme Court in *Aaron v. Havens*, 758 S.W.2d at 446, relied upon by plaintiffs. In *Aaron*, a landlord installed a fire escape which was allegedly installed in such a way as to unreasonably and dangerously allow easy access to the fire escape by people on the ground. The result was that an intruder allegedly gained easy access to a tenant's apartment. It was held in *Aaron* that such an action by the landlord may by itself (without any showing of prior criminal assaults on the premises) constitute a breach of a duty to a tenant. In *Aaron*, the court rejected the argument of the landlord that it was necessary for plaintiff to plead and prove that there had been prior criminal *assaults* on the premises. The court noted that the landlord was aware of a prior unlawful entry to the apartment by a burglar who entered from the balcony. The court said the danger was from "unauthorized entry." "If a burglar may enter, so may a rapist." [5] *Id.* at 448. *Aaron* is a case in which the active negligence of the landlord had created for the tenant a substantially *enhanced* risk of harm from criminal activities. *Aaron* did not involve the failure to install bars on the windows or the failure to

replace a burned-out light bulb. Nor, as the opinion notes, did *Aaron* involve an "entry hall" or an "area surrounding" the apartment. *Id.* at 448, n. 3. It involved active negligence in which the landlord allegedly actually created risks which would not otherwise have existed by causing the fire escape to be constructed in such a way to make the tenant more vulnerable to attack from a person unlawfully entering the apartment than she would have been otherwise.

Plaintiffs nevertheless interpret *Aaron* as changing previous rules so substantially that as a result of *Aaron*, they argue, landlords have a generalized duty to make common premises safe from generally foreseeable dangers, such as the threat of crime. We submit, however, that *Aaron* cannot reasonably be understood as creating a submissible case against a landlord any time a criminal assault occurs after an attacker gained access through a common area under the control of the landlord. The petition in *Aaron* would not, apparently, have been found to state a cause of action if, instead of involving an easily accessible fire escape, the case had involved only a broken window latch. Liability would apply in a window latch case only if there were some special circumstances causing the landlord to have a *security* duty with regard to the window latch. We derive this from the following statement in *Aaron*, 758 S.W.2d at 448, where the court discussed the allegation of liability based upon the failure to provide a lock on the window: "[t]he charges about the window lock provoke the inquiry as to whether the landlord has a duty to the tenant to repair the lock and whether the tenant could make the repairs herself." Also, we note that, as to allegations in the petition concerning an alleged failure to lock the door to a six foot fence around the back yard, the court stated it was not "prepared to endorse an abstract proposition that a landlord is required to provide gates or fences to keep intruders out of the yard...." As a result, we read *Aaron* as holding that the landlord's allegedly reckless *enhancement* of the ordinary risks of criminal assault consti-

---

**5.** Actually, a person unlawfully entering a living unit for the purpose of committing *any* crime is a "burglar." Sections 569.160 and 569.170 RSMo

1994. The point, of course, is that all unlawful entries were within the category of crimes which could be specifically foreseen in *Aaron*.

tuted a special circumstance upon which liability could be based. Such a "special circumstance" is akin to the already recognized "special circumstance" which exists when a landlord knows of the presence of a dangerous or violent individual on the premises, and the landlord fails to act within a reasonable time. *See Meadows* 655 S.W.2d at 718. We do not interpret *Aaron* as departing from the fundamental rule expressed in *Meadows* that "there exists no general duty to protect a plaintiff against the intentional criminal conduct of unknown third persons." *Id.* at 721. We agree with plaintiffs that *Aaron* shows the court is willing to determine foreseeability from *all the circumstances* of the case, without rigidly adhering to the requirement that the landlord have knowledge of prior violent crimes on the premises. We disagree, however, with plaintiffs' suggestion that *Aaron* abrogates the requirement that there be special circumstances of some kind as a condition of finding a duty to provide security.

In *Stubbs v. Panek*, 829 S.W.2d 544 (Mo. App.1992), a case decided by this court since *Aaron*, a landlord was held liable for the abduction of a child by a third party of a child at night while the family members slept. The criminals gained silent access through a defective door lock. In *Stubbs*, it was alleged that the lack of a functioning lock was a dangerous condition under the landlord's control. There was evidence that the tenant had repeatedly asked the landlord to install a functioning lock, with no success, and that the tenant was specifically forbidden by the landlord to repair the door to make it more secure. The landlord's alleged indifference to the tenant's security concerns was, without question, unconscionable. The landlord's recalcitrance continued for a period of time, setting the stage for an unlawful entry by persons apparently having notice of the condition of the lock. As a result, the tenants' daughter was abducted, sexually assaulted and murdered. This court reversed a trial court summary judgment ruling in favor of the defendant, holding that plaintiffs had made a submissible case. In *Stubbs*, the landlord's duty could be found to arise from special circumstances—the obvious special vulnerability of the tenant combined with the landlord's obstinate refusal to allow the tenant to repair the lock. *See Braitman v. Overlook Terrace Corp.*, 68 N.J. 368, 346 A.2d 76, 83–84 (1975) (where the court found in a defective lock case that there was an "enhanced risk" due to the defective lock). Moreover, the criminal act perpetrated was exactly the kind of crime feared by the tenant—and foreseeable to the landlord—an unlawful entrance by persons aware of the defective lock who gained entrance precisely because of the defective lock. *Stubbs* is a decision involving a duty based on sound policy considerations. If locks have any purpose at all beyond security, we are not aware of such purpose. It is certainly no surprise to landlords that they have a legal duty to respond to the tenant's request for the provision of a functioning door lock. And the duty relates specifically to the foreseeability of a silent, unlawful entry. Any landlord taking the approach of the landlord in *Stubbs* should know that it is engaged in a serious flirtation with liability. The duty arises not out of the mere fact that there is a landlord-tenant relationship, but out of the common sense of the special circumstances that the landlord kept exclusive control of this security matter, and unreasonably left the tenant exposed to the danger of a silent, unlawful entry.

*Miller's Duty Analyzed*
### a. The Porch Light

■ In the case at hand, the testimony shows that there was a defect in the operation of the light from Ms. Kopoian's apartment. Apparently, the problem with the light was that it could be turned off from the neighboring apartment without the knowledge of the occupants of Ms. Kopoian's apartment. Unless the switch was on in the neighbor's apartment, the switch in Ms. Kopoian's apartment was ineffectual to activate the light. The evidence tended to show that the light was not on at the time of the assault, although Ms. Kopoian had turned the switch on. The plaintiffs testified that it was not until after the fateful night of December 7, 1986, that they discovered why the light did not always function properly. Ms. Kopoian admitted in portions of her deposition received at trial that she did not even know

there *was* a problem with the light at all before the night of the assault.[6] She testified in her deposition that Callicotte went out often before the attack, and that she "always had the switch on and the light would be on." She acknowledged that she never discussed the light with anyone—either the maintenance man or the property manager. Mr. Callicotte, the son of Ms. Kopoian, testified that he discussed the light with Mr. John Howard, the maintenance man, on an occasion when Mr. Howard was over for a social visit:

A: I told John about the light not working, and John—the next time I talked to him, I asked him about the light, and John said he had tried to fix it.

Q: And did he indicate whether or not he had been successful?

A: No, he said he had not been successful.

Mr. Callicotte offered no testimony as to any further comments he may have made to Mr. Howard concerning the light. The record provides us no information as to the date of this discussion between Mr. Callicotte and the maintenance man—as to whether it was two days before the attack on Mr. Callicotte, or three months before.[7] There was no testimony to the effect that Callicotte expressed concern about the safety aspects of the malfunctioning light (as opposed to the concerns related to convenience),[8] or that Callicotte asked that the light repair be followed up after Mr. Howard's initial effort.

Ms. Kopoian's testimony indicated that the porch light switch controlled by Mr. Lawson, her neighbor, was turned on practically every night, illuminating the porch until well into the early morning hours. The fact that Mr. Lawson came home early on the night of the attack, and turned off his light switch, happened to be, according to Ms. Kopoian, "a first." Mr. Howard, the maintenance man, and the property manager, both denied any memory of ever being informed before the night of the attack that there was any problem with the light. But even assuming, by disregarding all contrary testimony and viewing the evidence in the light most favorable to the verdict, that the evidence allows an inference that the landlord had notice that the light was defective, we cannot find evidence that the landlord had notice that any security problem existed with regard to the likelihood of an attack on the porch such as occurred in this case. There was evidence that the landlord knew that exterior lighting was desirable, both for security and convenience, and had considered installing more exterior lighting.[9] However, such evidence does not establish a *duty* on the part of the landlord to ensure the effective functioning of the porch light for security purposes as against this kind of attack.

█ If there had been a duty in this case to guard against this kind of attack, such a duty would have required, at a minimum, an armed security guard keeping surveillance. A better porch light is, for all practical purposes, irrelevant to an attack of this kind. There was no contention at trial that the lack of lighting on the porch caused Callicotte to take longer to enter the apartment than he otherwise would have. And Callicotte evidently noticed no delay in attempting to enter, because when he was interviewed by the police after the assault, he informed them

6. At trial, she testified that sometimes when she went outside to get her cat at night, she found the light was not on even though she had turned the switch on. However, she did not state that these occasions preceded the attack, but occurred during the time she "lived in the townhouse," which included a span of time after the attack as well as before it.

7. The record shows that it was several years *after* the attack that defendant learned that any one was asserting that the light was not working properly on the night of the assault. All records concerning work orders and tenant requests had been destroyed by the time defendant first learned of plaintiff's allegations.

8. Callicotte testified that the reason he asked Howard about fixing the light was because when he attempted to retrieve the cat from the front yard at night, the lack of lighting complicated that endeavor.

9. There was a streetlight approximately 80 feet away from the porch. One of plaintiffs' security experts erroneously testified the light was over 500 feet away. There was testimony from plaintiffs' witnesses, however, that the porch area was quite dark.

that he believed the porch light was on when he arrived home. Also, plaintiffs presented no evidence that Releford had been drawn to shadows created by the lack of lighting, and then hid in them to gain an advantage on Callicotte.[10] Also, there was no testimony that any previous violent criminal assaults had taken place on the premises,[11] and no testimony that any violent criminals had been lurking near the front doors of any of the apartments,[12] or that anyone had any notice of Releford's violent activities. Further, there was no evidence that the porch in this case could be considered, like the fire escape reaching the ground in *Aaron*, an "invitation" to someone like Releford. *Aaron*, 758 S.W.2d at 447.

### b. The Height of the Bush

▮▮▮ Plaintiffs' submission as to the bush was based on the argument that the height of the bush near the front door was a dangerous condition which contributed to cause the injuries to plaintiffs. Plaintiffs contend that the bush may have obscured Callicotte's view and hindered his ability to get the jump on Releford. If Callicotte had seen Releford sooner, goes the argument, Callicotte would have overcome Releford and the injuries would have been avoided. Plain-tiffs offered expert testimony at trial that such bushes ideally should be no taller than two feet high. The testimony was that at the time of the assault the top of the bush was between four and five feet above the ground. The suggestion was that the bush hindered Callicotte's view of Releford as Releford approached while Callicotte was unlocking the door to the apartment. Staying with the issue of duty, however, we again examine the source of the alleged duty. Duty is not determined by the jury on the basis of the testimony of a security expert, although security experts may be helpful to the courts in determining the scope of duty.[13]

Under our analysis, the bush theory of liability suffers the same fate as the defective light theory of liability in this case—there is no special circumstance, either related to the bush or otherwise, creating a duty to provide security against a random assault such as this one. There was no evidence of any prior assaults, random or otherwise, on the premises, much less any assaults facilitated by overgrown bushes. Also, a glance at any of the photographs of the porch received at trial reveals that the bush could not be said to constitute an "invitation" to muggers in such a way as to substantially enhance the risk of

---

**10.** Plaintiffs presented no evidence as to how Releford approached Callicotte. Releford testified by deposition that he targeted Callicotte while Callicotte was still driving home, and that Releford then parked also, and reached Callicotte just as Callicotte was opening the door.

**11.** There was testimony that at another townhouse, someone had secretly entered through a window and taken a pistol from the tenant's purse while the tenant was napping. It appears that this occurred *after* the date of plaintiffs' injuries, but in any event, such an incident would have little to do with predicting the occurrence of an assault such as the one perpetrated by Releford.

**12.** Plaintiffs offered to show at trial that the neighborhood around the townhouses was the scene of frequent criminal actions, and that Miller would have been aware of the threat of crime in the neighborhood. The trial court refused to allow this evidence. If the facts of this case were different (for instance, if this were about a burglary where the burglar gained access through a defective lock as to which the tenant had requested repairs) such evidence would presumably be relevant to the landlord's duty. However, gener-ally speaking, special circumstances do not exist simply because the area in question is one of "high crime." *Irby v. St. Louis County Cab Co.*, 560 S.W.2d 392 (Mo.App.1977).

**13.** In some instances, the testimony of security consultants can actually tend to mislead or confuse the jury. For example, in this case plaintiffs' experts were permitted to offer opinions that if the porch had been properly lighted and the bush had been trimmed, the assault by Releford probably would not have happened. Plaintiffs' experts, of course, did not consider all the evidence. Jurors, as people of common sense, are at least as capable of making that kind of determination on their own, given the fact that they actually hear all the evidence in the case bearing on the issue of causation, while typically such consultants consider only part of the evidence. Moreover, there is nothing about such matters that makes security consultants (many of whom are actually salespersons who may be less than objective) more capable of drawing conclusions as to causation. *See Williams v. McCoy*, 854 S.W.2d 545 (Mo.App.1993) (expert opinion evidence as to point of collision inadmissible because jury capable of forming own opinion based on evidence obtained from witnesses).

a criminal assault occurring on the porch. It is not like the alleged condition of the fire escape in *Aaron.* Nor was there evidence that these tenants had raised any security concerns as to the bush, as occurred in *Stubbs.* Indeed, there was evidence that if they *had* raised security concerns about the bush, it probably would have been trimmed.[14] In sum, there was no evidence that this assault was the kind of criminal assault which would be anticipated to be especially likely as a result of having a bush be four or five feet tall near the porch (such as, for instance, an assault in which the attacker had concealed himself behind the bush).

### c. The Lack of the Deadbolt Lock

■ Plaintiffs also submitted on a theory that a dangerous condition existed because there was no deadbolt lock on the door. Plaintiffs contend that if there had been a deadbolt on the door, Callicotte would not have succeeded in opening the door at the moment he was struck on the head. Thus, they argue, the assault would have been contained on the porch and would not have entered into the apartment. This, they say, would have saved Kopoian and Mee from injury. Plaintiffs presented evidence that they had asked the property manager for a deadbolt, but that the manager failed to have one installed within a reasonable time. Unlike Callicotte's concern about having more lighting in order to be able to locate his cat more easily, plaintiffs' concerns about a deadbolt were obviously related to *security*—they wished to try to hinder burglars from gaining access to the apartment. The difference between this case and *Stubbs,* however, argues defendant Miller, is that in this case the lock was functional. Further, Miller argues, the nature of the lock had nothing to do with the kind of attack on Callicotte which occurred in this case. Releford's attack could not reasonably be considered to be related to the circumstances of the lock. The deadbolt, of course, is a burglary protection device. It is not designed to keep out of the apartment a

hapless tenant who is being assaulted on the porch. The evidence suggests that Releford, in his berserk mania, had no interest in gaining access to the interior of the apartment, because, once inside, his focus remained on getting Callicotte's wallet. It was apparently merely coincidental that Callicotte was struck from behind just as he unlocked the door.[15] Releford did not gain access by virtue of a defective lock. If this case had involved an assault by a burglar who had silently gained access to the house through a defective lock, plaintiffs would have made a submissible case under *Stubbs.* However, we are persuaded by defendant's arguments that plaintiffs have failed to show that the landlord had a security duty to provide a deadbolt lock which encompassed the duty to prevent random assaults like the one perpetrated by Releford in this case.

### *Duty and Proximate Cause*

■ In order to impose liability on the landlord, it is necessary that there be some fault attributable to the landlord for the criminal assault. There must be evidence that the landlord's negligence caused a condition of danger consisting of something greater than "that presented out on the street and in the neighborhood generally." *Erickson v. Curtis Inv. Co.,* 447 N.W.2d 165, 169 (Minn.1989). Crime is a possibility and a threat at all times and in practically every place. *Meadows,* 655 S.W.2d at 721. In *Aaron,* the landlord allegedly created a condition (an easily accessible fire escape) which would uniquely attract criminal activity and increase the vulnerability of the tenant. Similarly, in *Stubbs,* the landlord's unreasonable refusal to repair the lock and to allow the tenant to repair the lock created a circumstance of special vulnerability for the tenant, requiring that the tenant sleep in a house to which silent access could be gained especially easy. Locks may not keep people out, but they generally make it more difficult for burglars to gain access efficiently and

---

**14.** The evidence showed that other bushes among the townhouse units had been trimmed low or removed for security reasons, but that Kopoian's neighbor, Mr. Lawson, had requested that the bush be maintained as it was.

**15.** The causation analysis is a thin form of "but for" analysis, which may be insufficient to allow submission. *See Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 865 (Mo. banc 1993).

silently. Fire escapes are constructed in such a way as to preclude access from the ground (or make such access difficult) for purposes of denying access to those who would unlawfully enter. In both *Aaron* and *Stubbs,* the landlord's failures placed the tenant in a position of risk substantially greater than the risks to which people usually are exposed, even when out on the street generally. Also, in each case *it was the particular kind of risk (unlawful entry as opposed to an assault on the porch) which could reasonably be perceived in advance of the injuries which came to fruition in the criminal acts which occurred.* "The risk reasonably to be perceived defines the duty to be obeyed." *Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928).

In this case, by contrast, the evidence did not show that the risk of being attacked by Releford was increased by any action or failure of the landlord. As was stated in *Stanley v. Town Square Coop.,* 512 N.W.2d at 55:

> The risk of being criminally assaulted in the middle of the night in a poorly lit, unfenced parking lot in the Detroit metropolitan area is real and certainly can be anticipated. However, that risk is as obvious and apparent to an invitee as it is to the landowner. In short, the danger to which invitees are exposed in a parking lot is the same danger to which they are exposed in the community at large. The landlord has done nothing to create a condition conducive to criminal assaults.

In *Erickson,* 447 N.W.2d at 169, the court noted the victim's lack of ability in that case to claim that the landlord offered a "particular focus or unique opportunity for criminals and their criminal activities." "In approaching the problem, the authorities have generally recognized that the duty is not determined by the foreseeability of a criminal act, but upon whether a duty exists to take measures to guard against it." *Meadows,* 655 S.W.2d at 721. In other words, it is not the foreseeability of crime in general, but the existence of special circumstances, which gives rise to the duty to provide security.

We agree with defendant Miller that, even viewing the evidence in the light most favorable to the verdict, plaintiffs could not be said to have made a submissible case that any special circumstances created a duty on the part of the landlord to protect against a criminal assault such as the one perpetrated by Releford.

■ While duty and causation both involve foreseeability, duty is an issue of law, and causation is generally a matter for the jury. Juries are not instructed in, nor do they engage in, consideration of the policy matters and the precedent which go into the concept of duty. W. Page Keeton, Prosser and Keeton on Torts 236 (5th ed. 1984). With joint and several liability (so that the landlord can be made to pay the entire damage verdict even if the landlord was found one percent at fault and the criminal ninety-nine percent at fault), and with the cost of compensating muggings, rapes, and murders being extremely high, the issue of duty is full of social and economic consequences. Because the threat of crime is ever present, and because a landlord can almost always do more to provide security for tenants, it is not difficult to find in any case in which an assault has occurred that more security guards and more locked gates and more barred windows would have prevented the assault. If the landlord's liability can be premised on a nebulous responsibility arising out of the general foreseeability of crime, landlords will, in effect, stand in the position of guarantors of the safety and security of the person and property of tenants.

### Conclusion

There is no comfort in reversing this judgment, which would have provided compensation to injured victims of a vicious assault. Plaintiffs, however, simply have not shown in this case the existence of a duty on the part of Miller to protect the plaintiffs from the particular attack which occurred in this case. The trial court erred in denying defendant's motion for a directed verdict. For the foregoing reasons, the judgment is in all respects reversed.

ULRICH, J., concurs.

KENNEDY, J., dissents.

KENNEDY, Judge, dissenting.

I cannot think my colleagues have come out right in this case. I dissent.

As an appendix hereto, I attach my own opinion, which my colleagues did not accept. It explains my thinking about the case. I would affirm the judgments.

If, however, the plaintiffs' judgments are to be reversed, we should remand to the trial court to allow proof of the prevalence of crime in the vicinity such as to place the landlord upon notice of the danger of criminal assaults—notice which the majority opinion says was absent. The following evidence was offered by plaintiffs and excluded by the trial court. If admitted, it would have shown the landlord's notice of the prevalence of crime in the immediate vicinity of this assault:

1. In addition to the subject row townhomes, defendant controlled or owned two other townhouse properties on Broadway one-half block away, where a burglary had occurred, and a large apartment complex one-half block south at the foot of Washington, where Mee and Kopoian originally lived, in which there had been four robberies, three burglaries, and an assault prior to the incident at issue, and also owned another large apartment building one block west.

2. Directly adjacent to these properties or in the area immediately surrounding them, 10 robberies, 11 burglaries, and 8 assaults occurred, all within the three years preceding this attack. As early as 1981, tenants in the Miller Apartment complex one-half block away had served management with a petition demanding better lighting, locks and deadbolt locks because of "robbers, muggers and the like." Adequate night lighting was specifically demanded. A letter to the property manager from tenants demanding better locks was offered. In 1982, defendant contracted with off-duty police officers for foot patrol at its building one-half block way.

3. A property management survey performed in May, 1984 on a Miller property just around the corner from plaintiffs' townhouse stated "a number of break-ins and muggings have occurred in the month

of May ... the police have been contacted yet the problem still exists." The foot patrol mentioned above recommended in late 1984 to Lilly Womack, the resident manager, that Miller increase lighting and trim bushes one-half block away from the Releford assault because it was so dark.

4. Another document suggested that foot patrol was at one time hired for the townhouses in which plaintiffs lived. A flier from the Westport–Plaza Homes Association was delivered to the resident manager's address, asking for help because assaults in the area were up 225%. Plaintiffs' expert Cole authenticated the crime reports and his report was offered.

5. Grace Kopoian's deposition testimony that she spoke with the resident manager and maintenance man on the subject of increasing crime, as well as her testimony regarding the witnessing and reporting of an assault one-half block away were excluded. Her testimony that the maintenance man reported a burglary around the corner was excluded. Testimony that defendant hired a private guard service the day after the incident was offered to tie into their 1984 acknowledgement that calling the police was doing nothing.

6. An Offer of Proof was made regarding a conversation between the resident manager and Jackie Cook, which occurred in the 1984–1985 time frame in which Ms. Womack indicated they were aware of the burglary from the Cooks' garage and another one across the street, and that they had hired a security company who would be going around at night watching the premises.

7. Plaintiff offered the testimony of the neighbor across the street, Eldon Cook, that, in response to his report of a burglary, the resident manager had told him a security service had been hired and they had shined a light in his window in 1985. His testimony was also offered to prove there had been a burglary up the street and the wheels stolen from a car by the townhouses.

8. Plaintiffs offered testimony from the president of Westport Plaza Neighborhood

Association that he was aware of a shooting and robbery between 46th and Pennsylvania and where plaintiffs resided; he was aware of various car burglaries and assaults in the neighborhood; and that the Association met in the mid–1980s to establish a neighborhood watch program and report on crime. Lilly Womack testified she attended some of those meeting but this testimony was still excluded.

In *Moss v. National Super Markets*, 781 S.W.2d 784, 786 (Mo. banc 1989), the Supreme Court reversed a judgment for plaintiff, on the ground plaintiff had failed to make a submissible case. It remanded the case to allow the plaintiff to present evidence which plaintiff had not offered at trial. Plaintiffs' position in this case is stronger than the plaintiff's position in *Moss*, because here the plaintiffs offered the evidence at trial, and it was excluded. The following language in *Moss* is applicable to this case: "Numerous cases hold that an appellate court should reverse a plaintiff's verdict without remand only if persuaded that the plaintiff could not make a submissible case on retrial. The preference is for reversal and remand.... Here, ... the plaintiff was the respondent on appeal. She was not obliged to anticipate reversal, or to raise conditional points...."

I would affirm. But if the plaintiffs' judgment is to be reversed, it should be remanded for a new trial on the issue of liability only.

### APPENDIX TO DISSENT

Defendant George W. Miller & Company, Inc., appeals from judgments against it upon jury verdicts in favor of the respective plaintiffs, growing out of a criminal assault at the townhome residence occupied by the plaintiffs as defendant's tenants. The verdicts and judgments were: for plaintiff Callicotte, $75,000; for plaintiff Grace Kopoian, $150,000; and for the estate of Jerry Mee, $400,000.

Plaintiff Harry Callicotte and his mother (plaintiff Grace Kopoian) and her fiancee (plaintiff Jerry Mee) lived together in a townhouse at 4507 Washington in Kansas City. The townhouse was one of ten located in a row along the east side of Washington Street. The townhomes were owned by defendant George W. Miller & Co., which also owned ten townhomes across Washington Street, on the west side of the street. Plaintiffs' unit and 4505 Washington shared a single front porch, from which entry was made into both by their respective front doors.

Callicotte, a law student, was returning home in his car at 1:30 a.m. on December 7. He parked his car at the curb in front of the house. It was raining. Carrying a stack of books in his arms, he got out of his car and hurried to the door of his house. As he was standing on the small porch, or stoop, unlocking the single lock on the door, a robber came up behind him and struck him on the head with a baseball bat.

Callicotte fell against the front door, which sprang open. He fell inside the entryway of the house. The robber struck him again inside the hall, breaking his arms raised to defend against the attack with the bat.

Callicotte's mother, plaintiff Grace Kopoian, and her fiancee, Jerry Mee, who were inside the house, came to Callicotte's aid. The robber attacked them, too, with the baseball bat, injuring both of them. He stole Callicotte's wallet and fled.

The robber was apprehended and he confessed. He had been seeking money for crack cocaine. He had followed plaintiff Callicotte to his home. As Callicotte arrived home, the robber parked his car in a driveway down the street and north of plaintiffs' residence, his lights off. Armed with a baseball bat, he came across the narrow (from sidewalk to porch) lawn in front of plaintiffs' residence and overtook Callicotte on his porch.

Plaintiff Jerry Mee, after he had filed suit on December 4, 1990, committed suicide on February 6, 1991. Plaintiff Kopoian was appointed by the probate court as Mee's personal representative, and she was substituted for Mee as a plaintiff.

Upon trial of the case, the submissions of negligence, on behalf of Callicotte, were "either, the bush near the porch was taller than

24 inches high and as a result the porch area was not reasonably safe, or the porch light was defective and did not illuminate the porch area and as a result the porch area was not reasonably safe." Mee's and Kopoian's submissions were the two foregoing and a third one, to wit: that "the door to the townhome did not have a deadbolt and as a result the door was not reasonably safe."

It should be noted at this point that the porch and the lawn, where the bush was located, were common areas, under the control of the landlord. The condition of the light, and the absence of the deadbolt, were also under the control of the landlord. Repairs to the premises were the duty of the landlord.

Had defendant filed a motion for a new trial, and on appeal had asked for reversal and remand for a new trial, it would be our duty to examine whether the evidence supported each of the three submissions. MAI 1.02, Committee Comment (1991). If one or more of the submissions were supported by the evidence, we still would remand for a new trial if we found any one or more of the three were unsupported by the evidence. See, *e.g.*, *Bostic by Bostic v. Bill Dillard Shows*, 828 S.W.2d 922, 927 (Mo.App.1992). Defendant, however, did not file a motion for a new trial, but only a motion for judgment notwithstanding the verdict. On appeal it has asked for outright reversal, not for remand for a new trial. We will not reverse outright if any one of the three submissions was supported by the evidence.

We have determined, as we explain hereinafter, that the defective light submission was supported by the evidence, and we do not consider the absence of deadbolt submission or the overheight bush submission.

### SUBMISSIBILITY

Miller attacks the submissibility of plaintiffs' case at three points. It says, first, that Miller had no duty to protect plaintiffs from criminal attacks of third persons. It says, second, if Miller did have such a duty, Miller's acts and omissions, charged by plaintiffs to have been negligent, did not fall below the

standard of reasonable care. It says, third, that any such acts or omissions, if negligent, were not the proximate cause of plaintiffs' injuries.

Defendant's argument is that one is liable for another's injuries at the hands of a third-party criminal only in two instances. One such instance is where there is a special relationship between the defendant and plaintiff, in which plaintiff has relied upon the defendant to provide safety. *Faheen v. City Parking Corp.*, 734 S.W.2d 270, 272 (Mo.App.1987). Such relationships include innkeeper-guest, school-student, and employer-employee. *Keenan v. Miriam Found.*, 784 S.W.2d 298, 302 (Mo.App.1990). The relationship of landlord-tenant is no such relationship, Miller says, citing *Advance Rental Ctrs. v. Brown*, 729 S.W.2d 644, 646 (Mo.App. 1987). The other situation where defendant may be liable for injuries suffered at the hands of a third-party criminal, says Miller, is where there have been other crimes which would place the landlord on notice that the tenant was in danger of a violent criminal attack. In order to place the landlord on notice of the danger of violent criminal attacks, according to Miller's argument, the other crimes must have been violent, numerous, recent, on the premises, and of a similar nature to the attack upon the plaintiff. It cites *Faheen*, 734 S.W.2d at 273–74; and *Conroy v. Solon Gershman, Inc.*, 767 S.W.2d 381 (Mo.App.1989). Plaintiffs, Miller says, show neither a special relationship between themselves and Miller, nor the other crimes which would place Miller upon notice of plaintiffs' danger from a criminal's violent attack.

Our case is ruled, however, by *Aaron v. Havens*, 758 S.W.2d 446 (Mo.1988) and by *Stubbs v. Panek*, 829 S.W.2d 544 (Mo.App. 1992). In those cases, the respective landlords made the same arguments as Miller makes in the present case. Our Supreme Court in *Aaron* rejected the landlord's formulaic approach in that case. To quote from the opinion: "The owner of an apartment building has a recognized duty to use due care to make common premises safe, as against foreseeable risks . . . ." *Aaron*, 758 S.W.2d at 447–48.

The evidence (stated most favorably to the verdict, of course, see, *Osborn v. Orthopaedic Ass'n of Kansas City, Inc.*, 844 S.W.2d 36, 39 (Mo.App.1992)), was as follows:

## DEFECTIVE PORCH LIGHT [1]

There was evidence which supported the submission of the defective light as a ground of negligence. The porch was common to plaintiffs' residence and the adjoining residence, in the same building, occupied by Dan Lawson. There was a light on the porch, but it was not on at 1:30 a.m. on December 7, 1986, when Callicotte was attacked and robbed. The light was controlled by switches in plaintiffs' residence and the other residence. The light could be turned on from plaintiffs' residence, but it could be overridden by the switch in the other residence. On the evening before the assault, Mrs. Kopoian had turned on the porch light, but Mr. Lawson had turned it off later. The light was off and the porch was dark when Callicotte came home and was assaulted.

Callicotte before the assault had asked that the light be fixed. Miller's maintenance man had tried to fix it, but he told Callicotte he was unable to do so because of the wiring. There is no evidence that Miller called an electrician to fix the light, although Miller had an electrician "on call," and electrical repairs were given priority treatment.

There was evidence that Miller was aware of the importance of lighting as a security measure, as evidenced by additional lighting which it had installed behind the buildings, and which it had considered but had not done because of wiring problems. The importance of lighting had also been discussed in a property management course which had been attended by Miller's property manager.

Plaintiffs' experts testified to the need for adequate lighting as a security measure. They testified that lighting had the dual effect of deterring crime, and also giving the victim an opportunity to see the approach of an attacker and to defend himself or to flee. The jury could believe from the evidence that Miller was negligent in failing to repair the light, so that the porch light could be controlled by the occupants of plaintiffs' residence.

The jury could also believe from the evidence that, if the porch and the surrounding area had been lighted, Callicotte would have seen the approach of the robber in time to defend himself. Callicotte was young and strong, and schooled in hand-to-hand combat, and could very likely have overpowered the robber. The darkness gave the robber the advantage of surprise. Callicotte saw only a shadow over his left shoulder in the instant before he was struck on the head with a baseball bat.

## OTHER CRIMES

Defendant argues that there was no proof of other similar crimes on the premises, and that, in the absence of such proof, it had no duty to its tenants to take the security measures which plaintiffs say were lacking. The occurrence of other crimes bears upon the foreseeability of criminal attacks, and landlord's duty to take reasonable preventive measures.

The plaintiffs showed only one other crime. This was in April, 1986, when a burglar came through a back window, while the occupant was sleeping, and stole her handgun. This occurred in another of the Washington Gardens townhomes, and the jury could infer that Miller had notice thereof. Plaintiffs offered to prove a number of other crimes in the general vicinity (the Plaza–Westport

1. When the evening closed in, the difficulty and danger of walking about London became serious indeed. [M]ost of the streets were left in profound darkness. Thieves and robbers plied their trade with impunity.... [I]n the last year of the reign of Charles the Second, ... [a]n ingenious projector, named Edward Heming, obtained letters patent, conveying to him, for a term of years, the exclusive right of lighting up London. He undertook, for a moderate consideration, to place a light before every tenth door, on moonless nights, from Michaelmas to Lady Day, and from six to twelve of the clock.... The friends of improvement extolled him as the greatest of all the benefactors of his city. What, they asked, were the boasted inventions of Archimedes, when compared with the achievement of the man who had turned the nocturnal shades into noon day?

—Macauley, History of England

area), including Miller properties, and a general community alert about the risk of crime, but the proof was excluded by the court. If it had been admitted, it would undoubtedly have strengthened plaintiffs' contention that Miller had notice of the risk of criminal conduct on the premises. Its absence weakened plaintiffs' contention. Still, we think the evidence was sufficient to make a submissible issue of Miller's notice of the danger of criminal conduct harmful to the tenants, sufficient to give rise to a duty on Miller's part to take reasonable measures to protect them.

On the issue of notice, we have the evidence of the single unauthorized entry which was allowed to be proved. We have evidence of security measures and precautions which Miller had taken, indicative of its awareness of the danger of criminal conduct. There is evidence that security was a matter of discussion at property management forums. These two items of proof simply add support to the dictum in *Meadows v. Friedman R.R. Salv. Warehouse*, 655 S.W.2d 718, 721 (Mo. App.1983): "In a practical sense, crime (violent or non-violent) is regrettably foreseeable in today's society any place, any time." Miller can hardly be heard to say that in a mid-city urban area, where it had a number of rental units, and where security precautions had been a matter of concern both to residents and to Miller personnel, it was unaware of the prevalence of crime.

The heightened awareness of crime, on the part of landlord and tenant alike, increased the foreseeability of plaintiffs' injuries. It placed upon the landlord a more urgent duty to take such protective measures as were within the area of his responsibility. This area of responsibility, as we have noted, included the common areas, and included the repairs and maintenance over which he had retained control. The precautions required of the landlord by the standard of reasonableness may vary from one place to another, but that is for the jury to resolve, under proper instructions. We are not dealing here with the violent crimes exception, noted

in *Faheen*, to the general rule that landlords are not liable for assaults upon their tenants by third persons. Proof of other violent crimes is not essential in a case like the present one, according to the holding of *Aaron*.

## PROXIMATE CAUSE

Allowing for present purposes that it was negligent in the particulars submitted, Miller argues that such negligence was not the proximate cause of plaintiffs' injuries. It is speculation, Miller argues, to say that its negligent acts and omissions, if they were in fact negligent, were "substantial factors"[2] in the injuries to the plaintiffs. If Miller had cut down the bush to 24 inches in height, if it had fixed the light, the robber's assault would still have probably occurred in the same way. And if it had installed the deadbolt, the time it took Callicotte to unlock the second lock would make him more vulnerable to attack on the porch. The safety of the people inside would have been purchased at the cost of increased risk to the person outside.

As we are taught in *Callahan v. Cardinal Glennon Hosptial*, 863 S.W.2d 852 (Mo. banc 1993), there is the threshold requirement that the proof show prima facie that the injury would not have happened "but for" the negligence of the defendant. As Judge Thomas said in *Callahan:* "Some lawyers and judges have come to look upon the 'but for' test as a particularly onerous and difficult test for causation. Nothing could be further from the truth. 'But for' is an absolute minimum for causation because it is merely causation in fact. Any attempt to find liability absent actual causation is an attempt to connect the defendant with an inquiry or event that the defendant had nothing to do with. Mere logic and common sense dictates there be some causal relationship between the defendant's conduct and the injury or event for which damages are sought." We take it that *Callahan* did not do away with the "substantial factor" test; that case simply shows that both criteria are

**2.** See *Jackson v. Ray Kruse Construction Co., Inc.*, 708 S.W.2d at 669; Restatement (Second) of Torts, Sec. 431(a) (1965).

involved in "proximate cause" (Prosser), or "legal cause" (Restatement (Second)). *Callahan*, 863 S.W.2d at 861. It must be shown prima facie that the injury would not have happened "but for" defendant's negligence, and also that the defendant's negligence was a "substantial factor" in bringing about the plaintiff's injury.

The evidence in this case survives both tests. The jury could have believed in this case, that, "but for" the defendant's negligence in failing to repair the light, the assailant would have had the opportunity to defend himself against the attack, or to flee. (There was evidence to the contrary, which was argued to the jury. The jury rejected that position. The question before us, of course, is only whether there was evidence to support the jury's verdict.) They could have believed that defendant's negligence in failing to repair the light was a "substantial factor" in the plaintiffs' injuries.

The following language (untouched by the overruling decision of *Callahan*) from *Jackson v. Ray Kruse Construction Co., Inc.*, 708 S.W.2d 664, 667 (Mo. banc 1986), is appropriate here:

> "This case would be characterized by Professor Wright as one of 'doubtful' causation, akin to a case involving a public swimming pool in which a child drowns while the lifeguard is absent. It is extremely difficult to prove that the drowning would not have occurred if the lifeguard had been present, but it would certainly be reasonable for a jury to conclude that the presence of a lifeguard would make the chances of rescue 'more likely than not.' Professor Wright argues that no more should be required and his view has substantial support. There are obvious difficulties in this case in setting up a counterfactual situation which definitively projects the sequence of events under the assumption that a safety bump had been in place. Striving for certainty is a tour de force. The jury must deal in terms of probabilities." *Id.* at 667.

Proximate cause is assessed by viewing the event after the fact. *Schaffer v. Bess*, 822 S.W.2d 871, 876 (Mo.App.1991). If after the fact, the injuries are rationally traceable to the act of negligence, the jury may find the proximate cause link between the negligence and the injury, even though the injury might have occurred in an unexpected and an unforeseeable way. *Id.* at 876.

We hold that the evidence made a submissible case of proximate causation.

### MEE'S PERSONAL INJURIES vs. WRONGFUL DEATH

Defendant George Miller & Co., as another reason it should have judgment against the Jerry Mee estate claim, says that, since Mee's personal representative claimed that Mee's death resulted from the injuries, Mee's cause of action did not survive to the personal representative under Section 537.020, RSMo 1986. That statute specifically includes only those "causes of action for personal injuries, other than those resulting in death...." If the injuries resulted in death, says defendant, then it is a wrongful death claim, under Section 537.080, RSMo 1986.

If a person sustains injuries resulting in his death, the claim must be presented as a wrongful death claim under Section 537.080, RSMo 1986. If he sustains injuries and later dies, not as a result of the injuries, his claim for damages for the injuries survives to his personal representative. Section 537.020, RSMo 1986. The two claims are inconsistent and mutually exclusive. *Damerel v. Sabina Realty Corp.*, 603 S.W.2d 96, 98 (Mo.App. 1980); *Long v. F.W. Woolworth Co.*, 159 S.W.2d 619 (Mo.1942). Jerry Mee's personal representative, Grace Kopoian, after Mee's death by suicide, amended Mee's petition to substitute herself as personal representative as plaintiff. She alleged, in the amended petition, that Mee's suicide was caused by his injuries. There was also evidence, in the form of an expert's opinion, that Mee's injuries contributed to cause his suicide. This evidence was not amplified.

Miller's position is that there was an issue whether Mee's death by suicide resulted from his injuries. That being the case, Miller says, it was incumbent upon the personal representative, in order to establish the survival of Mee's personal injuries claims, to plead, prove and submit to the jury the ques-

tion whether the death did not result from the injuries. See *Damerel,* 603 S.W.2d at 98. That Mee's death did not result from the injuries we think was not a "truly controverted issue." See *Long,* 159 S.W.2d at 623. While plaintiff presented some evidence that Mee's suicide was caused by his injuries, she struck that allegation from her petition before the case was submitted. Plaintiff told the jury in argument they could give no damages for Mee's suicide; the damages stopped at that point. The Mee damage instruction submitted "such sum as you believe will fairly and justly compensate the estate of Jerry Mee for any damages you believe Jerry Mee sustained between the time of the assault up to the time of his death as a direct result of the occurrence mentioned in evidence." The court's language in *Long* is applicable to this case. Plaintiff elected to proceed on the theory that the death did not result from the injuries. Defendant's liability and the measure of damages were the same as if Jerry Mee had not died. The court so understood it, the jury so understood it, and the defendant so understood it. It was held in *Long* that, in such a case, it was not necessary for plaintiff to allege, prove and submit to the jury the fact that Mee's death was not caused by his injuries. *Id.* at 622. In agreement, see *Damerel,* 603 S.W.2d at 98–99.

The judgments are affirmed.

NOTE:   THE FOREGOING IS NOT THE OPINION OF THE COURT, BUT IS AN APPENDIX TO A DISSENT.