**John LETSINGER, Appellant,**

v.

**DRURY COLLEGE, Beta Iota House Corporation, and Joe Lee Daniel, Respondents.**

**No. SC 84172.**

Supreme Court of Missouri,
En Banc.

Feb. 26, 2002.

Monte P. Clithero, Warren E. Harris, Springfield, for Appellant.

Lincoln J. Knauer, Springfield, Douglas R. Richmond, Micheal L. Matula, Kansas City, for Respondents.

Joe Lee Daniel, Pacific, pro se.

**PER CURIAM.**[1]

On May 31, 1997, Joe Lee Daniel entered a fraternity house located at Drury College campus and shot plaintiff Letsinger. Letsinger sued, alleging negligence. Drury and Beta Iota's motions for summary judgment were granted. Because a genuine issue of material fact exists, the judgments are reversed and the case remanded.

## STANDARD OF REVIEW

 A motion for summary judgment will be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Rule 74.04(c)(3)*. On appeal from a summary judgment, this Court reviews the record in the light most favorable to the party against whom judgment was entered. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). This Court does not defer to the trial court's judgment granting summary judgment because review is de novo. *Id.* at 376.

## FACTS

Drury owns land in Springfield. A fraternity house used by Beta Iota chapter of Kappa Alpha is located there. Letsinger lived there. There were female visitors earlier in the evening when the assault occurred. Some males who were not member of the fraternity began calling the house concerning the visitors. Letsinger did not know the callers. The conversations escalated. Letsinger ultimately indicated to the caller that he should either shut up or come over and fight. After this conversation, Letsinger became nervous about what was going to happen. He tried to close and lock the front door. Daniel arrived at the house, opened the front door, pulled a gun from behind his back, crudely alleged incest, and shot Letsinger.

Letsinger pleaded that Drury had the duty to "properly maintain and repair" the house, including "the front door, and to insure that basic security of its occupants and integrity of the building were maintained." Letsinger alleged Drury breached that duty, which proximately caused his injuries. Additionally, Letsinger alleged "Beta Iota, as lessee [of Drury], had a duty to properly maintain and repair the building and insure the basic security of its occupants ... if ... Drury ... failed to do so." He further alleged Beta Iota breached such duty, which also proximately caused his injury.

The contract between Drury and Beta Iota contained a maintenance paragraph:

> 9. *Maintenance:* [Drury] agrees to maintain the premises in a good state of repair, interior and exterior, within the limits of the reserve maintained for such purposes and within the discretion of [Drury] as to the need for repair, maintenance expenses and capital improvements, except that [Beta Iota] is required to make any repairs, including glass breakage, which may be necessary because of damage resulting from gross negligence, or wilful, intentional or malicious acts.

Another paragraph provided: "[Drury] and the authorized representatives of [Drury] shall have the right to enter the leased premises at all reasonable times to examine the condition thereof, but ... not ... in a manner to interfere unreasonably with the occupation by [Beta Iota]."

1. The appeal in this case was originally decided by the Court of Appeals, Southern District, in an opinion by the Honorable Kenneth W. Shrum. Following transfer to this Court, *Mo. Const. art. V, sec. 10,* portions of that opinion are incorporated without further attribution.

## DISCUSSION

■ Defendants sought summary judgment on the theory that, by the undisputed material facts, Defendants had no duty to protect Letsinger from an intentional criminal act by Daniel. Defendants also argued that even if they had a duty to maintain and repair the house, Letsinger could not show that a breach of such duty proximately caused his injuries.

■ Letsinger concedes that, as a rule, a defendant has no duty to protect another person from a deliberate criminal attack by a third person. *Stubbs v. Panek*, 829 S.W.2d 544, 546 (Mo.App.1992); *see also Scheibel v. Hillis*, 531 S.W.2d 285, 288 (Mo. banc 1976). However, an exception to this rule exists when: (1) a landlord-tenant relationship exists between two parties, and (2) "other 'special circumstance[s]' [are present] warranting, as a matter of policy, the shift of responsibility for the tenant's security from the tenant to the landlord." *Vittengl v. Fox*, 967 S.W.2d 269, 275 (Mo. App.1998). In the landlord-tenant exception, "it is not the foreseeability of crime in general, but the existence of special circumstances, which gives rise to the duty [in a landlord] to provide security[ ]" for the tenant. *Kopoian v. George W. Miller & Co., Inc.*, 901 S.W.2d 63, 74 (Mo.App. 1995). "Special circumstances" in this context means evidence that shows the risk of being attacked was increased by some action or failure of the landlord; i.e., the landlord's action or inaction presented the criminals with a particular focus or unique opportunity for their criminal activities. *Id.*

■ Here, unlike most cases, there are disputes about whether a landlord-tenant relationship exists and, if so, who was a tenant and who was a landlord. The relation of landlord and tenant is that which "arises from a contract by which one person occupies the real estate of another with his permission and in subordination to his rights[.]" *Marden v. Radford*, 229 Mo. App. 789, 84 S.W.2d 947, 954 (1935). The essentials of a landlord-tenant relationship are: (1) a reversion in the landlord; (2) the creation of an estate in the tenant either at will or for a term less than that which the landlord holds; (3) the transfer of exclusive possession and control of the premises, or a portion thereof, to the tenant; and (4) a contract, either express or implied, between the parties. *Hill v. Eads*, 970 S.W.2d 882, 883 (Mo.App.1998); *Friend v. Gem International, Inc.*, 476 S.W.2d 134, 137–38 (Mo.App.1971).

The record in this case contains no written contract or other evidence of an express agreement between Letsinger and Drury, or between Letsinger and Beta Iota, that clearly defines the relationship between the respective parties. Stated otherwise, nothing in the record establishes, as a matter of law, the character of Letsinger's occupancy as that of tenant or lodger or licensee or something else.

The record is replete with conflicting and contradictory evidence that must be resolved to decide if a landlord-tenant relationship existed and, if so, who was the landlord. As an example, there was conflicting evidence about who collected rent from the occupants. Letsinger's affidavit recited he was to "pay $60 to the fraternity to live in the house during the summer semester." Contrarily, Drury employees Parker and Sweeney testified the "fraternity" set the room rate for occupants, but Drury billed and collected the rent from each occupant. Moreover, the Drury/Beta Iota lease provided for Drury to collect rent from occupants.

Contradictory evidence also existed about who made occupancy decisions for the house. The Drury/Beta Iota contract provides that Drury's "policy" governs the

approval of occupants. Testimony that Drury would not allow non-KA students or KA freshman to live in the house was consistent with the contract language. On the other hand, there was evidence that if Drury received too many applications from persons who wanted to live in the house, it was the "fraternity officer" and alumni advisers who decided that occupancy question. Additional confusion regarding ultimate control over occupancy arises from evidence that alumni advisors decided whether fraternity members could live in the house during summer months.

Yet another example was the conflicting and contradictory evidence regarding what documents existed relating to the occupants. Drury employee Sweeney, who had supervisory authority over student housing, testified Drury provided two forms for students to sign regarding residency in a fraternity house. The first simply required the student to indicate where he or she wanted to live, i.e., on or off campus. The second form required those who opted for fraternity housing to designate which fraternity they chose. At one point, Sweeney referred to these forms as merely "applications," which were part of the student registration process, and at another time referred to a "one page-contract" prepared by Drury that was filled out "prior to moving in that's really a part of the registration process." On the other hand, Sweeney had general knowledge of the fact that many fraternities on Drury's campus made their own contracts with the occupants of their houses regarding policies, fees, periods of residency, and related matters. Sweeney was unsure whether such a contract existed for these occupants.

This and other evidence in the record show there are material issues of fact about whether a landlord-tenant relationship existed for the house occupants and, if so, who was the landlord. This Court need not address the other issues raised by the parties as to Defendants' duty, because the duty is dependent on the existence (or non-existence) of a landlord/tenant relationship, and its characteristics.

The judgments are reversed, and the case is remanded.

LIMBAUGH, C.J., WHITE, WOLFF, BENTON, LAURA DENVIR STITH and PRICE, JJ., concur.

HOLSTEIN, J., not participating.