Pam VITTENGL, Respondent,

v.

Robert FOX, et al. d/b/a Quarry Ridge Apts., Appellants.

No. WD 52780.

Missouri Court of Appeals, Western District.

Submitted Aug. 6, 1997.

Decided April 21, 1998.

Robert P. Numrich, Kansas City, for appellants.

James Crabtree, Lenexa, KS, for respondent.

Before SMART, P.J., and LOWENSTEIN and ULRICH, JJ.

SMART, Presiding Judge.

This case involves issues of duty and proximate cause in the context of a third party criminal assault. The owners of an apartment complex appeal a jury verdict against them and in favor of a former tenant of the apartment complex for damages sustained as a result of a criminal assault perpetrated by an unidentified attacker. Robert and Marlys Fox, Fred and Kathie Bordman, and Mark and Pam Woodward, doing business as The Quarry Ridge Apartments in Independence, Missouri, appeal the verdict entered February 9, 1996, in favor of Pam Vittengl in the amount of $780,550. Defendants contend on appeal that plaintiffs failed to plead and prove facts showing defendants had a duty to protect plaintiff from third party assaults. They further contend that plaintiff failed to present a submissible case that any alleged failure on defendants' part was the proximate cause of plaintiff's injuries. Concluding that plaintiff failed to establish a cause of action under Missouri law, we reverse the judgment.

## The Assault

Plaintiff Pam Vittengl resided at the Quarry Ridge Apartment complex in Independence on Wednesday, February 22, 1989. Although she ordinarily worked nights until 5:00 a.m., on this occasion her duties were such that she left her employment at about 1:00 a.m. She drove straight home to Quarry Ridge, where she had resided for four years. Quarry Ridge, which is east of Brookside in Independence, is composed of 48 units. The building in which Ms. Vittengl resided faced south. Between the west edge of the building and the street was a grassy area (depicted in photographs appended to this opinion). This small grassy area is across Brookside Road from the grounds of the Johnson Monument Company and Mount Washington Cemetery. The parking lot for Ms. Vittengl's building is in front of the building, on the south. On the night in question, Ms. Vittengl arrived about 1:15 a.m. She parked her car in the parking area in front of the building.

After plaintiff got out of her car and began to walk up the sidewalk abutting the parking spaces to proceed to the door of the building, she was overtaken by a man who came from the parking area. She observed that the man was white, age 22–30, tall, 160–70 pounds, with shoulder length brown hair, wearing a brown plaid wool coat. The man grabbed her from behind with his arm around her neck. He pulled her off the sidewalk and forced her around the corner to the west side of the building, where he struck her each time she tried to scream. Although he verbally threatened to cut her throat, there was no indication he had a knife. He then pulled her around to the street side of the sign bearing the name of the apartment building, where he pulled hard at her breast. After this struggle in the grassy area on the west side of the building, he dragged her across the street by her coat and hair to a wooded ravine. He threw her down and began kicking her repeatedly. A tenant in the building, who had been awakened by the noise of someone crying, trying to scream, and being beaten, came outside to look. Observing no activity, she went back in and dialed 911. In the meantime, across the street in the ravine, Ms. Vittengl's attacker had pulled off Ms. Vittengl's pants and then thrust a stick or some other object into her vagina. He then proceeded to beat her on the head with a rock or other object, until he suddenly stopped and ran away. A few moments later, a policeman responding to the 911 call discovered her.

Ms. Vittengl was rushed to the hospital by the police. She underwent hospitalization and extensive treatment, but still suffers from the physical and emotional effects of this trauma. Thus far, no one has been apprehended and charged with the commission of this crime. The record does not disclose whether the police have any information at all concerning the identity of the

perpetrator or whether any other crimes have been linked to this one.

## The Action

Plaintiff Vittengl brought an action against the owner of the apartment complex. She contended at trial that the owners of Quarry Ridge were negligent in allowing two specific conditions which directly caused or contributed to cause damage to plaintiff: (1) the sign on the west side of the apartment building was greater than 20 square feet in total size and as a result contributed to create an area that was not reasonably safe; and (2) the area on the west side of the building was not lighted and as a result was not reasonably safe.

At trial, Plaintiff testified there were no lights on the west side of the building at the time of the attack. Plaintiff also presented the testimony of Richard Gist, Ph.D., who testified that he is a "community psychologist" educated in the "specific area of psychology dealing with the impact of events and circumstances or the functioning behavior of communities." He has studied crime, and he has provided "profiling" services to law enforcement agencies. He testified that he was assuming, for purposes of his testimony, that at the time of the attack, there was no lighting on the west side of the building, in accordance with the testimony of Ms. Vittengl. At the time of trial, the entire perimeter of the building, including the west side, was lighted with mercury vapor lighting near the roof. New fixtures were installed in 1992, three years after plaintiff was attacked. Dr. Gist's only visits to the scene were after the installation of the new lighting, and after the removal of the sign of which plaintiff now complains. Dr. Gist testified over objection that, in his opinion, at the time of the attack, based on Ms. Vittengl's testimony, the apartment complex was "an extremely attractive spot for a crime of this nature to occur." He testified that the failure to light the west end of the building, together with the fact that

the landlord had placed a large sign toward the street at the west end, and the fact that there was significant foliage, enhanced the likelihood of criminal activity there. He testified that he thought that, without the west end of the building being equipped with lights on the building, the only light which would get to the west end would be ambient light from the nearby streetlight. Dr. Gist testified that in his opinion the criminal in question was a psychopath looking for a place well suited to such a crime. He assumed that plaintiff's assailant had been out driving around looking for a favorable spot for a crime, and had seen this complex, and decided to stake it out and wait for a victim. He opined, again over objection, that if the lighting on the west side of the building which the landlord later added in 1992 had been there in 1989, and if the sign had not been there in 1989, the psychopath would not have selected that spot for a crime, but rather would have driven on to look for a better place. Dr. Gist concluded that the individual committing the crime planned the crime in advance and drove away from a car parked at another location because the police determined that all of the cars on the apartment parking lot that night were accounted for. He had the opinion that if the "set up" had been different, the criminal would have looked for another place to commit the crime. He testified that it is his opinion the owners of the apartment building should have arranged for a "security review" with a security firm before this incident.

Plaintiff submitted on these two contentions of negligence (the size of the sign, and the lack of lighting on the west side), utilizing an instruction based on MAI 22.05 which allowed the jury to assign liability to the defendants if the jury found that either condition was not reasonably safe,[1] and that defendant knew, or by ordinary care, could have known, of either of these conditions, and failed to use ordinary care to make the area safe.[2] After four days of trial, the jury found

---

1. Because of the disposition of this case on other grounds, we need not address herein issues raised by appellants related to the fact that the plaintiff, under the disjunctive submissions in her instruction, was required to prove that the lack of lighting and the size of the sign each independently constituted a dangerous condition, while

the testimony of Dr. Gist suggested only that they *combined* to create a dangerous condition.

2. Defendants did not raise an issue at trial as to the applicability of this instruction (applicable to tenants injured in a common area of an apart-

in favor of plaintiff and awarded her damages in the amount of $780,500. The defendant owners appeal the verdict.

## Sufficiency of the Petition and the Landlord's Duty

Defendants raise first the contention that the judgment is void because the petition fails to state a cause of action. They argue that the only power possessed by a court without subject matter jurisdiction is the power to dismiss the action, citing Rule 55.27(g)(3). They contend that because failure to plead a cause of action is jurisdictional, the issue may be raised at any time during the proceedings, even for the first time on appeal. They also contend that the plaintiff failed to prove facts giving rise to a duty on the part of the landlord.

Plaintiff's petition in this case stated in pertinent part as follows:

4. The defendants, as owners of the apartment complex, have a duty to provide adequate parking, security, maintenance and lighting, and to listen to, and respond to, requests of tenants for additional lighting and security. Tenants had previously told the defendants and their representatives of their concern that there was inadequate parking, inadequate lighting, and inadequate security measures.

5. The attack on the plaintiff was the direct and proximate result of the negligence of the defendants in failing to adequately maintain the premises; failing to have adequate lighting; failing to properly secure the area; failing to have adequate parking; failing to have adequate trained security personnel and office management; failing to have adequately trained maintenance people; and failing to heed the request of tenants for additional lighting and increased safety measures.

As to the sufficiency of the petition, defendants point to the fact that, generally speaking, landlords have no duty to protect tenants from the criminal acts of third parties. While acknowledging that there are exceptions to the no-duty rule, defendants argue

that plaintiffs must plead facts which affirmatively show the existence of circumstances giving rise to a duty on the part of the landlord. Otherwise, they say, a petition pleading a general duty is wholly contrary to law and insufficient as a matter of law. We agree with defendants' general statement of the law.

■ Defendants are correct that a petition in a negligence case must allege facts which show (1) the existence of a duty on the part of the defendants to protect plaintiff from injury, (2) the failure of defendants to perform the duty, and (3) an injury resulting from that failure. *Scheibel v. Hillis*, 531 S.W.2d 285, 288 (Mo. banc 1976).

## The Security Duty of Landlords Generally

■ A landlord's duty of security to a tenant is a matter of law. *Aaron v. Havens*, 758 S.W.2d 446, 447 (Mo. banc 1988). "In the final analysis the matter [of duty] is one of policy." *Advance Rental Centers, Inc. v. Brown*, 729 S.W.2d 644, 646 (Mo.App.1987). "[Duty] is entirely a question of law . . . and it must be determined only by the court." W. Page Keeton, Prosser and Keeton on Torts § 37 (5th ed.1984).

■ The first issue we encounter in this case is whether the owners had a security duty to conform their sign to the code standard of 20 square feet, and to provide for lighting on the west side of the building. Plaintiff provides no authority directly on point. Defendants rely on the established rule that the landlord has no general duty of security because there is no "special relationship" between landlord and tenant as there might be in other contexts. *Schelp v. Cohen–Esrey Real Estate Servs., Inc.*, 889 S.W.2d 848, 850–51 (Mo.App.1994). "Special relationships" include those situations in which a party entrusts himself to the protection of another and relies upon that person to provide a place of safety. *Id.*; *see Virginia D. v. Madesco Investment Corp.*, 648 S.W.2d 881 (Mo. banc 1983) (hotel owner's duty to guest could arise out of knowledge of prior

ment building due to a *physical* defect in the premises) to a claim of injury caused by a third party criminal. In view of the fact that MAI 22.05 does not accurately reflect the law related

to third party criminal assaults, as discussed *infra*, our recitation of the history of this case should not be understood as implying approval of the use of MAI 22.05 in this context.

criminal incidents.) The landlord-tenant relationship is not in itself a "special relationship." *Schelp,* 889 S.W.2d at 851. Thus, a duty of security could arise only out of "special circumstances." *Meadows v. Friedman R.R. Salvage Warehouse,* 655 S.W.2d 718, 721 (Mo.App.1983); *Kopoian v. George W. Miller & Co.,* 901 S.W.2d 63, 67 (Mo.App. 1995).

 A landlord in Missouri does not have a general duty to provide security for the purpose of deterring criminal acts of third parties. *Schelp,* 889 S.W.2d at 851. A variety of approaches are followed in different jurisdictions. *See* Annotation, Landlord Liability—Criminal Acts, 43 A.L.R. 5th, 207 (1996). We conclude that in Missouri as well as many other states a duty will generally be found only when there are special circumstances, such as when the landlord has made contractual or other representations or assurances to the tenant concerning security,[3] or the landlord had notice of the danger because there have been previous instances of crimes of similar character on the premises,[4] or the landlord has exposed the tenant to an enhanced risk of crime, and the landlord has notice of the risk,[5] or the landlord knows of the presence of a particular dangerous or violent individual constituting a risk to the tenant,[6] or there is some other "special circumstance" warranting, as a matter of policy, the shift of responsibility for the tenant's security from the tenant to the landlord. *Meadows v. Friedman R.R. Salvage Warehouse,* 655 S.W.2d 718, 721 (Mo.App.1983). This is simply in keeping with the traditional rule that, absent a special relationship or special circumstances, a party has no duty to protect another person from the deliberate criminal attack of a third party. *Id.; See, e.g., Bartley v. Sweetser,* 319 Ark. 117, 890 S.W.2d 250, 252 (1994) (Newbern, J., concurring); *Martin v. Usher,* 55 Ill.App.3d 409, 13 Ill.Dec. 374, 375, 371 N.E.2d 69, 70 (1977). Policy reasons for the traditional rule include: judicial reluctance to tamper with a traditional common law concept; the notion that the deliberate criminal act of a third person is the intervening cause of harm to another; the difficulty that often exists in determining the foreseeability of criminal acts; the vagueness of the standard the owner must meet; the economic consequences of imposing such a duty; and conflict with the public policy that protecting citizens is the government's duty rather than a duty of the private sector. *Faheen v. City Parking Corporation,* 734 S.W.2d 270, 272 (Mo.App.1987) (plaintiff's decedent killed by bomb in parking garage of apartment; court adopted rule that duty may arise if landlord has notice of previous instances of similar violent crime, but found no duty in that case). In *Meadows v. Friedman R.R. Salvage Warehouse,* 655 S.W.2d 718, 721 (Mo.App.1983), we noted that the question of duty involves the "question of fairness." The court in *Meadows* referred to the policy discussions in *Goldberg v. Housing Auth. of Newark,* 38 N.J. 578, 186 A.2d 291, 298 (1962). The court in *Goldberg* mentioned the fact that the cost of security would likely be passed disproportionately to tenants in high crime areas. *Id.* 186 A.2d at 298. Needless to say, the cost of compensating crime victims and defending litigation would also be passed disproportionately to those in high crime areas. The court in *Goldberg* also expressed concern about fairness issues related to the vagueness of the landlord's responsibility. *Id.* at 297. The court also mentioned the "exceptional uncertainty with respect to the issue of causation." *Id.* This is because of "the extraordinary speculation inherent in the subject of deterrence" of criminal activities. *Id.* For these and other reasons, many courts have been reluctant to find a general duty of security, and have required a showing of special circumstances giving rise to a duty to protect tenants from criminal activities. *Cf. Advance Rental Centers, Inc. v. Brown,* 729 S.W.2d 644, 645 (Mo.App.1987).

---

3. *See, e.g., Veazey v. Elmwood Plantation Associates Ltd.,* 650 So.2d 712, 715 (La.1994).

4. *See, e.g., Faheen v. City Parking Corp.,* 734 S.W.2d 270 (Mo.App.1987) (adopting rule that previous violent crime on premises may give rise to duty).

5. *See, e.g., Aaron v. Havens,* 758 S.W.2d 446, 447 (Mo. banc 1988) (previous unlawful entry to a tenant's apartment from fire escape was notice to landlord of risk of tenant being raped in another unlawful entry).

6. *See, e.g., Scheibel v. Hillis,* 531 S.W.2d 285, 288 (Mo. banc 1976).

In *Kopoian v. George W. Miller & Co.*, 901 S.W.2d 63 (Mo.App.1995), this court was forced to deal squarely with the issue of the landlord's duty of security in a relatively similar context. In that case, victims of a criminal assault had obtained a verdict against a landlord on the theory that the landlord was negligent in failing to provide security in that the porch light on the rental unit was defective, the bush near the porch was excessively large, and the residence was not equipped with a dead bolt lock. *Id.* at 66. It was contended by the plaintiffs in that case that Missouri had abrogated any requirement of "special circumstances" in connection with the establishment of a duty of security. *Id.* at 68. The analysis we undertook in that case included a study of the Missouri Supreme Court's decision in *Aaron v. Havens*, 758 S.W.2d 446 (Mo. banc 1988), and the subsequent decision of our court in *Stubbs v. Panek*, 829 S.W.2d 544 (Mo.App. 1992). We concluded that, in spite of some of the expansive language of *Aaron v. Havens*, the law in Missouri still did not impose on landlords a general duty to provide security for tenants, either as to the security of the units themselves, or as to common areas under the control of the landlord, absent "special circumstances."[7] *Kopoian*, 901 S.W.2d at 70.

■ If we were correct in *Kopoian* that Missouri still adheres to the requirement of "special circumstances" before a landlord duty of security is created, then an allegation stating merely that "defendants, as owners of the apartment complex have a duty to provide ... security ..." falls far short of appropriately pleading the landlord's duty.

## Because The Petition Was Not Challenged Until After Judgment, We Review The Evidence To Determine Whether It Could Have Been Amended to State a Cause of Action

■ Had this petition been subjected to a motion to dismiss for failure to state a cause

of action, it would have been proper for the trial court to have granted the motion. However, when the sufficiency of a petition is not attacked until after judgment, we apply a less stringent standard in evaluating its sufficiency. *Davis v. City of St. Louis*, 612 S.W.2d 812, 814 (Mo.App.1981). In a case where the issue of sufficiency of the petition was not raised, and the pleading could have been amended to state a proper claim, the petition will be held valid after the verdict. *Id.* In *Davis*, the plaintiff brought an action against the City for negligence. Plaintiff failed to plead that the City was acting in a proprietary capacity, although it was essential to allege the proprietary capacity of the City in order to state a claim. *Id.* The court noticed, however, that the defendant City did not raise the sufficiency of the pleading until its motion after the verdict, which was too late. The court stated that a petition "which 'only imperfectly pleads a claim but which is amenable to a proper statement of that claim without changing the cause of action will be held good after verdict.'" *Id.* (quoting *Barber v. Allright Kansas City, Inc.*, 472 S.W.2d 42, 44 (Mo.App.1971)). *See also State ex rel. Gardner v. Webber*, 177 Mo.App. 60, 164 S.W. 184, (1914).

Here, no challenge was made to the sufficiency of the petition until after judgment. Had a challenge had been made to the petition, plaintiff presumably would have sought to amend the petition in accordance with the evidence she produced at trial.

## Plaintiff Was Required To Prove Facts Creating a Duty of Security

■ Defendants contend that plaintiff failed to prove facts giving rise to a duty on the part of the defendants to protect plaintiff from the criminal attack because plaintiff failed to show any previous violent crime on the premises or obvious grounds for notice of the risk, and failed to show any misfeasance on the part of the landlord which created an extraordinary danger.

---

7. The dissent of Judge Lowenstein views *Aaron* as recognizing a duty to use due care to make the common premises surrounding the building safe as against foreseeable risks. We would point out that, while some language in *Aaron* seems to suggest the proposition Judge Lowenstein de-

scribes, the opinion in *Aaron* made a point of noting that that case did not involve an "entry hall" or an "area surrounding" the building. 758 S.W.2d at 448, n. 3. Consequently, we doubt that *Aaron* can be taken beyond its own facts.

In this case, plaintiff's evidence showed that the police had responded to the apartment building for matters such as domestic disturbances and theft from automobiles. There had also been a report of a "peeping tom," and plaintiff's daughter had reported the theft of some of her underwear from the laundry room. However, plaintiff did not show, and it cannot reasonably be inferred from the evidence, that the owners, exercising ordinary care, would have had notice *before this incident* that the existence of a large sign, and the lack of lighting on *the side* of the building, would have made it especially likely (in relation to the risk in the community generally) that a tenant would be accosted in the parking area in the front of the building, then dragged to the west side, and then taken across the street. Moreover, plaintiff's contention that several incidents of property crimes in the parking area and laundry room created a duty of security to foresee and to guard against a violent crime of this nature simply is not in accordance with the law. *Schelp v. Cohen–Esrey Real Estate Servs., Inc.*, 889 S.W.2d 848, 851 (Mo. App.1995); *Kopoian v. George W. Miller & Co.*, 901 S.W.2d 63, 67 (Mo.App.1995).

### Plaintiff's Evidence Failed to Show There Was Anything Which Would Have Put the Defendants on Notice That the Apartment Complex Presented a Greater Risk of Violent Crime Than Other Locations in the Community Generally

Plaintiff hypothesized that the owners of the complex should have engaged security experts for a "security review," and that security experts would have informed the defendant owners that, among other things, they needed to light the west end of the building and to reduce the size of the sign because the sign exceeded the size permitted by city code.[8] Presumably, according to plaintiff's theory, the security experts would have informed the owners of the risk that a psychopath would view this location as a favorable spot for a brutal murder or assault. The evidence did not suggest that the ordinary person would have appreciated a special danger of the occurrence of this type of crime, except perhaps in hindsight, after the crime against plaintiff had occurred. Plaintiff also did not present any evidence that any representations or assurances had been made to plaintiff by the owners about lighting the west end of the building. There was also no evidence that any commitments concerning security had been made in any lease agreement.

There was nothing in the evidence to show that it would be manifest to the ordinary person that the unlighted *side* of a building presents a security problem when that side of the building is not an area which tenants would normally be expected to use at night, and is relatively close to the public street, and is lighted by a public streetlight.[9] This case was not submitted on a theory that the *parking lot* was unlighted, or that the *sidewalk* from the parking lot to the building was unlighted. The case was submitted on the theory that the *side* of the building, the side closest the public street, was not lighted by

8. Defendants contend on appeal that the trial court erred in allowing submission of the sign theory because plaintiff completely failed to prove that the sign ordinance in question had anything to do with security. We agree. The sign ordinance permitted "one non-illuminated free standing or wall sign not exceeding 20 feet in area designating the name of the building or complex...." The language of the ordinance in question is clearly directed to aesthetics and not security (otherwise it would not forbid lighting of such apartment signs). In order to utilize an ordinance to create a duty, plaintiff must show she was in the category of persons intended to be benefited by the ordinance. *Williams v. Nuckolls*, 644 S.W.2d 670, 673 n. 4 (Mo.App.1982). This she completely failed to do.

9. The dissent suggests that the neighboring tenant who placed the distress call to 911 could not see the attack, implying that plaintiff and her attacker were still on the west side of the building, but that it was so pitch black at that spot that they could not be observed. We believe that inference is not warranted by the record. While we cannot say definitively what the neighbor meant when she said she could not observe "anything," we believe in context she was indicating she observed no activity. The circumstances indicate that by the time the neighbor got outside, plaintiff and the attacker were already across the street in the wooded ravine. We find no reason to believe the neighbor was testifying about the degree of darkness.

the owners, and was encumbered by a sign which should have been 20 square feet instead of approximately 32 square feet. Neither in her petition nor in her evidence does plaintiff show that the owners, exercising ordinary care, should have recognized that their apartment building presented a greater risk of such an attack than would exist in general in the community at large. Thus, although plaintiff's jury instructions hypothesized defendants' responsibility in terms of "ordinary care," the thrust of the case was that defendants should have conducted themselves at the level of security experts. The law requires only a duty of ordinary care, however. *Cf. Pickle v. Denny's Restaurant, Inc.,* 763 S.W.2d 678, 683 (Mo.App.1988) (restaurant operator held only to standard of "ordinary care," not the standard of a security expert).[10]

▇ Plaintiff testified at trial that, approximately a year before this incident, she made a verbal request that the west end of the building be lighted. She did not testify as to the specific wording of her request or as to the landlords' response to her request. There was no evidence at trial that any other tenants made any requests related to lighting at all, although she so alleged in her petition. It could be argued that the fact that plaintiff on one occasion made a verbal request that the lighting on the west end of the building be increased is sufficient, in itself, to constitute a "special circumstance" which would create a duty to increase the lighting. However, we do not believe that her request in this case could be regarded as *ipso facto* creating a legal duty, especially in the absence of other evidence that the owners otherwise had notice that their tenants were exposed to a greater than ordinary degree of

risk created by the failure to put lights on the west end of the building. If her request alone could create the duty, then perhaps her request for a security booth with an armed guard would have created a duty to employ that measure. In comparison to the level of trauma she suffered, is an armed guard too great an expense? Consequently, we are reluctant to hold that plaintiff's request that the west end of the building be lighted was sufficient in itself to give rise to a duty to install such lighting.

Plaintiff also contends that because, at trial, several of the owners acknowledged that there should be lighting all the way around the building in order to deter crime, there was evidence establishing that the owners had culpable knowledge of the danger of a criminal attack. It is tempting, in order to try to sustain this verdict, to hold that the owners' gratuitous statements amounted to an admission of a duty of security, or constitute a "special circumstance" creating a duty. Basing a legal duty upon a subjective statement or opinion would be questionable, however.[11] In any event, we need not resolve the issue of whether these statements could give rise to a duty, because of our ruling on defendants' contention related to the issue of causation discussed below.

### Plaintiff Failed To Offer Evidence That Any Alleged Defect In The Premises Caused The Attack

▇ Defendants also contend on appeal that plaintiff failed to establish any evidence that any security deficiency was the proximate cause of plaintiff's injuries. Indeed, it was necessary that plaintiff present evidence that *but for* the negligence of the defendants, the injuries would not have oc-

---

10. Plaintiff also presented evidence as to "accepted community standards for apartment management" as though the landlord-tenant relationship is a relationship imposing a special duty of care on landlords. If the standard is one of ordinary care rather than a specialized duty of care, such evidence as to "accepted community standards for apartment management" is, of course, immaterial. *Pickle,* 763 S.W.2d at 683.

11. It is unclear what these statements showed. The owners said the west side was lighted in 1989, and plaintiff said it was not. The only independent evidence was one photograph which

seemed to indicate there were no lights on the west end of the building. The owners may also have been referring to the streetlight in their comments that the building was lighted all the way around. We are not sure what the jury believed because, under the verdict director, the jury could have rendered the same result if they thought that the *sign,* and not the *lighting,* was the unsafe condition. However, we assume the jury believed there was no lighting on the west end of the building, other than ambient light from the streetlight.

curred. *Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852, 861 (Mo. banc 1993). The "but for" requirement is a minimum standard in most cases. *Id.* Proximate cause also requires a measure of foreseeability in addition to "but for" causation: the injury must be a reasonable and probable consequence of the act or omission of the defendant. *Id.* at 865. Plaintiff's only attempt to prove causation in this case was presented through Dr. Gist, who was permitted to testify over defendant's objections concerning whether the premises had appropriate security measures and were reasonably safe from the standpoint of crime, and, based upon his beliefs about the unknown assailant, whether changes to the premises would have protected plaintiff from this occurrence.

 Section 490.065.1 RSMo 1994 provides:

In any civil action, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Testimony is not expert testimony, regardless of the witness' academic or teaching credentials or experience, unless the witness is utilizing and applying scientific, technical, or other specialized knowledge. If such specialized knowledge is not applied, the witness is merely drawing an inference which the jurors are just as capable of drawing. In order to be able to offer his or her opinion, the expert's competence on the subject must be superior to that of the ordinary juror, and the opinion must aid the jury in deciding an issue in the case. *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 208 (Mo. banc 1991). Expert testimony should not be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, of drawing correct conclusions from the facts proved. *State v. Sloan*, 912 S.W.2d 592, 596 (Mo.App.1995). Where the jury is as competent as the proposed expert to draw conclusions, an expert's testimony may be excluded. *Stucker v. Chitwood*, 841 S.W.2d 816, 819 (Mo.App.1992); *Williams v. McCoy*, 854 S.W.2d 545, 550–52 (Mo.App.1993).

Expert testimony may well confuse or mislead a jury when the expert is offering conclusions about a matter which is not a proper subject of expert testimony. In such a case, the jury may be swayed by the speculation of the witness. Defendants contend on appeal that there was absolutely no indication in this case that Dr. Gist's opinions on causation were informed by any scientific methodology or expertise. The fact that he is a psychologist who studies crime and public safety issues does not, in itself, make his speculation more valuable than the speculation of anyone else. The plaintiff could have taken the witness stand and expressed *her* opinion that if the sign had been somewhat smaller, and if there had been more lighting on the west end, the assault would never have happened. She could have based her opinion on her belief that the attacker singled out this apartment complex because of its security deficiencies and waited for a victim. Her opinion would have been speculation. The opinion would not be evidence which could support a verdict in her favor. Dr. Gist likewise made no reference to any studies, statistics, or findings. His opinion that the attacker was a psychopath may have been an exercise of "profiling," but that observation, besides being something the jury probably did not need a psychologist to tell them, did not entitle him to then speculate about things which are neither part of a criminal's "profile" nor the practice of psychology.[12]

---

12. It is difficult to find any cases in which "psychological profiling" testimony has been held to be admissible. One reason for the reluctance of the courts to accept such evidence is that it tends to lend to a "battle of experts" which diverts the jury from the central issue. *See State v. Elbert*, 831 S.W.2d 646 (Mo.App.1992). The issue seems to have come up frequently in the context of profiling sex offenders. *See, e.g., State v. Par-* *kinson*, 128 Idaho 29, 909 P.2d 647 (App.1996). The court there noted that expert testimony on the sex offender profile had been almost universally rejected, noting that it had not gained general acceptance in the scientific community, invades the province of the jury, and does not assist the trier of facts to determine a fact in issue. *Id.* 909 P.2d at 651.

Defendants point out in their brief that the courts have not been particularly solicitous of allowing expert testimony as to a general duty of security or as to causation factors in third party criminal assaults. In *Bowman v. McDonald's Corp.*, 916 S.W.2d 270 (Mo.App. 1996), a customer who was accosted in the parking lot of the restaurant by armed robbers, and shot, sued the operators of the restaurant for inadequate security. The plaintiff proposed to present expert testimony on security. The trial court refused to allow an expert to offer his opinion that the assailants were on the property to rob the restaurant, not to steal appellant's car. The trial court also refused to allow expert testimony as to whether the presence of an armed security guard would have prevented the attack on plaintiff. The court of appeals agreed with the decision of the trial court. "The jury was perfectly capable of reaching intelligent conclusions on the issues of the intent of the robbers and the effectiveness of a security guard on the night in question based on the evidence before them." *Id.* at 283. In *Pickle v. Denny's Restaurant, Inc.*, 763 S.W.2d 678 (Mo.App.1988), the plaintiff had been on the restaurant premises to apply for a job when he was shot in the parking lot. This court held that the trial court was within its discretion in concluding that the subject of premises security was within the common knowledge of the average lay juror and that expert testimony on the subject could be excluded. In this case, Dr. Gist was allowed to testify as an expert on the security deficiencies of the premises even though he could not base his opinion on the fact that he had seen the premises when they were in the condition they were at the time of the incident, because he did not see the premises until three years after the changes.

■ Defendants also argue that there is a danger generally of allowing attenuated reasoning where an initial inference is drawn from a fact and other inferences are built cumulatively upon the first so that the conclusion reached is too remote and has no sound logical foundation in fact. *Wills v. Berberich's Delivery Co.*, 345 Mo. 616, 134 S.W.2d 125 (1940). Such reasoning lacks probative force. *Braun v. Roux Dist. Co.*, 312 S.W.2d 758 (Mo.1958). The question of whether an expert opinion is based on and supported by sufficient facts or evidence is a question of law for the court. *Stan Cushing Constr. Co., Inc. v. Cablephone, Inc.*, 816 S.W.2d 293 (Mo.App.1991).

Here, Dr. Gist reasons from the fact that it was a brutal, sadistic assault, and from the fact that the attacker apparently did not have a car at the scene, to conclude that the attacker had selected this particular spot for an attack, and had carefully planned the crime, including leaving his car on the other side of the monument company grounds. Expert testimony aside, one may hypothesize that Ms. Vittengl was a random victim, because there is no evidence that the attacker knew Pam Vittengl or had chosen to stalk her for some reason. However, the lack of evidence does not amount to proof that she was a random victim. Further, defendants are correct that there is no *scientific* reason to make such an inference—it is merely a factual hypothesis which one could suggest. Next, Dr. Gist concluded it was a well-planned crime. His conclusion again is not based upon specialized knowledge, but is merely a suggestion anyone could make from 1) the fact that the attacker left the premises on foot without leaving a vehicle behind, and 2) the assumption that the attacker had a car because most criminals have cars. According to Dr. Gist, the attacker very shrewdly left his car on the other side of the monument company so he could get away on foot first, and then take his car from that location.

The inference that this was a well-planned crime is subject to challenge on common sense grounds. The attacker apparently did not have a knife or any other weapon, and had to try to silence the plaintiff by hitting her. It is obvious that a knife or other weapon is more effective in keeping a victim from trying to scream. Also, the weapon could be of assistance if anyone tried to come to the aid of the victim. One also might wonder, if the attacker had a car, why he did not attempt an abduction, rather than parking his car on the other side of the monument company. Thus, we do not *know* that this was a well-planned crime. Nor do we *know* that the attacker carefully selected this apartment complex. In any event, even if we

were to assume that the attacker selected the apartment complex for some reason (rather than stalking Ms. Vittengl in particular) the next question is whether Dr. Gist has specialized knowledge or training which he applied in determining *why* the attacker selected this apartment complex. Can Dr. Gist, because of specialized knowledge, point out a reason to conclude that it is unlikely that this apartment complex was selected merely because it was handy at the time? Can Dr. Gist, because of specialized knowledge, point out a reason to conclude that it is unlikely that the attacker was walking nearby, saw Ms. Vittengl, and made a spur-of-the-moment decision to attack her? Can Dr. Gist, because of specialized knowledge, point out a reason to conclude that it is unlikely that the attacker selected this particular apartment complex because of the fact that there was a wooded ravine across the street from it? Can Dr. Gist, because of specialized knowledge, point out a reason to conclude that it is unlikely that the attacker was at this particular apartment complex because he had come to see (or to attack) someone else who lived there? Can he, because of specialized knowledge, rule out the possibility that any failure to have lights on the west end of the building was merely incidental to other factors motivating the attacker to select this location, rather than the *cause* of the selection? Despite repeated objections to the testimony as speculative, Dr. Gist explicitly set out his train of thought. While his thought processes have a facial plausibility, they were not in any way grounded in psychological research. He was simply, in the manner of an amateur detective, drawing inferences from facts, and then extending those inferences based on assumptions. This thought process may be paraphrased as follows:

1. Because no car was left behind, this must have been a well-planned crime.

2. Because this was a well-planned crime, the perpetrator must have carefully selected the location at which to commit the crime.

3. Because the perpetrator carefully selected the location at which to commit the crime, he must have found features at this location which made it attractive.

4. Because the perpetrator must have found features at this location which made it an attractive place to commit a crime, there must *be* features at this location which would attract such a perpetrator to this location.

And, although Dr. Gist would not agree that this is part of the process, it is obvious that, having established that there must be security deficiencies in the premises, the next step would be simply to survey the facts related to the premises, to determine which features are most likely responsible. In this case, the west end of the apartment building would seem like a possibility, because the attacker took Ms. Vittengl to the west end of the building and assaulted her there before taking her across the street to the ravine. Never mind that the attacker did not hide on the west end, and then come at Ms. Vittengl from that location. He did take her to the west end before taking her across the street. Therefore, it is reasonable (according to this reasoning process) to conclude that the factors on the west end were what drew him to this location. The conclusion that this apartment was "an attractive place to commit a crime" may in reality be the end of the thought process, although it is presented as being the starting point.

Under this approach to proving causation, once one asserts a plausible major premise (that the crime was well-planned), then everything else flows toward liability, even if the reasoning is circular.[13] Once the point has been made that it was a well-planned crime, the landlord's liability is already logically established because the attacker would not have selected this site unless it had some kind of security deficiency. Another nice aspect of it is that Dr. Gist can render an expert opinion not only as to causation, but also as to lighting conditions on the premises

13. We do not for a minute believe Dr. Gist would agree with our characterization of his remarks, or of his reasoning processes. However, his basic assumptions influence his perception of the circumstances, and the reasoning process he employs. Although Dr. Gist's reasoning seems logically appealing, we suggest that it actually incorporates several logical fallacies, primarily *Petitio Principii* (Begging the Question). *See* **Ruggero J. Aldisert, Logic for Lawyers 201–206 (1989).**

without even seeing what the exact lighting conditions were! Thus, instead of causation being difficult to prove, it becomes very easy to prove because of the underlying assumptions.

Reflection also reveals the obvious problems here. For instance, the validity of the final conclusion depends upon the accuracy of the notion that this was a well-planned crime. It also depends upon the assumption that the attacker was not stalking Pam Vittengl in particular. Moreover, it depends on the assumption that the attacker had transportation at his disposal, and that it was therefore convenient for him to survey all the potential crime sites in a large area, to select the best. It also depends on the assumption that it was not something else unrelated to security conditions which brought the attacker to that apartment complex that night, and that Ms. Vittengl's appearance presented an opportunity for an unplanned assault. It also depends on the assumption that the attacker was engaged in rational thought, and was not under the influence of some mind-altering drug at the time. If any of these assumptions are not true, then the whole logical progression does not work. It really boils down to whether we allow ourselves to accept the simplistic notion that the fact that the crime occurred proves that there was some security defect in the premises which caused it to occur.

Because Dr. Gist's testimony involved no specialized knowledge and yet was presented as evidence rather than as speculation, it was misleading. It was an abuse of discretion not to sustain the objection that the testimony was unduly speculative. Dr. Gist's testimony did not constitute evidence of causation, and there was no legitimate evidence of causation presented. If we believed that Dr. Gist, on remand, could demonstrate that he really had a basis of specialized knowledge for his causation analysis, we could, perhaps, exercise discretion to remand the case to give plaintiff another chance to establish causation. We see no way, however, that the causation analysis, which is based on very few facts and includes extrapolations and circular reasoning from inferences which are themselves contingent, can constitute any evidence that the attack would not have occurred but for the lack of lighting on the west end of the building. It is our duty to assume that it is true that, as plaintiff testified, it was "dark" on the west end. It may also be true that if there had been better security conditions on the west end of the building, the assault would not have happened. However, there is no *evidence* from which a jury could reasonably reach that conclusion. Plaintiff did not present a *prima facie* case that the defective conditions bore a relationship of proximate cause to plaintiff's injuries.

### Conclusion

Ms. Vittengl was an innocent victim of a savage crime. Every human instinct cries out for a way to prevent such tragedies. Yet we dare not violate the ordinary canons of legal responsibility in an effort to obtain compensation for her.

For the reasons stated above, we conclude that plaintiff failed to plead and to prove a cause of action against the defendants for the third party criminal assault.

The judgment is reversed.

ULRICH, C.J., concurs.

LOWENSTEIN, J., dissents in separate opinion.

Addendum attached.

ADDENDUM

---

LOWENSTEIN, Judge, dissenting.

It is with reluctance that I file this dissent to the majority opinion of Judge Smart. Whether we as a society want to admit it or not, the fact remains a large portion of the population is single, and of necessity must rent living quarters, and are not in a position to make frequent changes in rental quarters. These people are at risk from just the kind of person who committed this assault on the plaintiff. Society, government, police, etc., have labored for years, without much success, to protect these and other citizens from violent crime.

I do not here propose that landlords be saddled with the legal duty of protectors or absolute insurers of tenant safety. What Missouri law should do is encourage landlords to take quantifiable preventative measures to thwart crimes against those who rent from them. Here, for example, there

was a sign in a poorly lighted common area between the building and the street, and since there had been a call by a tenant for better lighting, it would have been relatively simple to install lighting, and relatively cheap to pay the electricity. If the cost to the landlord is to be passed on to the tenant, so be it. Surely the costs associated with lighting grocery store entryways are passed on to the public at the cash register. Surely, too, the cost of security guards increasingly seen at merchants' stores is a portion of the charge paid by the customer, and the cost of bodyguards for corporate executives is passed on to the consumers of that company's products.

The "special circumstances" exception for landlord liability, which has been adopted in the "modern trend of authority" has as its elements: (1) notice of repeated criminal activity on the premises where the criminal activity occurred, (2) the portion of the premises where the criminal activity occurred was exclusively in the landlord's control, and (3) the landlord had the exclusive power to take preventative action, but failed to do so. *Advance Rental Centers, Inc., v. Brown*, 729 S.W.2d 644, 646 (Mo.App.1987) (citing *Kline v. 1500 Mass. Ave. Apmt. Corp.*, 439 F.2d 477, 481 (D.C.Cir.1970)). It is clear that the sign and lighting of the exterior of the building were exclusively in the landlord's control, and that the landlord failed to take preventative measures. The only element missing in this case is the notice of prior violent criminal activity. It seems unfair to perpetuate the requirement of this element, for the result would be to allow the next victim at the apartments to make a case, based on the misery of Vittengl. *Language in Aaron v. Havens*, 758 S.W.2d 446, 447–8 (Mo. banc 1988), casts doubt on the efficacy of the past crimes element as requiring they be the same as the crime committed in the pending case. "It is not necessary to allege that past crimes involving entry into unauthorized places are of the same general nature as one that gave rise to the claim." *Id.* at 447.

In *Aaron* the Supreme Court of Missouri recognized that a landlord has a duty to use due care to make the common premises surrounding the apartment building safe, as against foreseeable risks. *Id.* There is nothing wrong in finding a landlord duty here. There was no lighting in the common area on the west side of the building. Large open areas (a cemetery) were nearby. The tenant complained and asked for lighting. The landlord has agreed lighting was needed. The neighbor who reported the matter to the police could not see the attack. To rest on traditional common law requirements, in this factual context, misses the mark. Under these facts, the special circumstance exception quoted by the majority at page 275 should apply. The sign and lack of lighting, other than street lighting on the west side, exposed the tenant to an enhanced risk of crime, and the landlord had notice of the risk.

There can be no question that the lighting issue here could only have been addressed by the landlord. The tenants were in no position to install lights on or near this building. "[A] landlord is under a duty to exercise ordinary care to keep the portion of the premises he retains control over in a reasonable safe condition for the use identified and is liable for damages for personal injuries resulting from his failure to perform that duty." *Stubbs v. Panek*, 829 S.W.2d 544, 546 (Mo.App.1992). In *Stubbs*, the plaintiff "made repeated complaints about the door and asked for it to be repaired, but it [the dead-bolt lock] was not repaired." *Id.* at 547. The same scenario held true in *Aaron v. Havens*, supra, 758 S.W.2d at 448, where the Court determined the fire escape was part of the common area and the landlord had exclusive control to make repairs and allow the tenants better protection over a fire escape, and such protection was "reasonably available." See, *Johnston v. Harris*, 387 Mich. 569, 198 N.W.2d 409, 410 (1972). (Vestibule and porch lighting).

In sum, the landlord, as compared to the tenant, was in a better position to provide requested protection in the form of lighting on an unlighted portion of the building, for the purpose of minimizing a risk to the tenant. It is not proposed that the landlord be the insurer, or even the alter ego of the police, but only to take the readily identifiable and, as here acknowledged by the landlord, the common sense and easily defined step to provide lighting. *Kline v. 1500 Massachusetts Avenue Apartment Corp.*, 439 F.2d 477, 484, 487–8 (D.C.Cir.1970). The

*Kline* court, acknowledging higher rental costs would be the result of it's decision, went on to say that without the protection, the tenant already pays in losses from physical assault and higher insurance premiums. The sizeable jury verdict does not, and should not detract from the conclusion that the plaintiff made a submissible case, and but for instructional error on the size of the sign, made this case one for a jury's decision.

Question must also be made of the analysis in the majority, pages 14–20, of there being insufficient evidence of duty and causation. Under the majority analysis, an expert could not testify because any testimony of opinion would be subject to objection as speculative, and objectionable as invading the province of the jury. So too would be the self-serving testimony of the victim. Assuming, without agreeing, that the Dr. Gist testimony was improper, what else could plaintiff have done here to make a case, other than to elicit the testimony of other tenants as to safety conditions in the common areas or that of the assailant as to why he chose that particular victim or location. The plaintiff's request for lighting on the west side of the building, even though a year prior to the attack, was sufficient to submit the case to the jury. She should not have been required to have to testify or explain the landlord's response, if any. Her request for lighting was not infirm because she failed to predict she would be a victim or would be beaten, dragged and poked with a stick. If indeed her request was proper, and lighting was needed, the ball was in the landlord's court, experts or no experts, to take the reasonable precaution to install lights.

I would reverse the judgment for the reason of instructional error in allowing the jury to reach a verdict against the landlord because the sign was larger than allowed by municipal ordinance, and would remand for and allow a new trial since the plaintiff made a submissible case against the defendant. *Medina v. 187th Street Apartments, Ltd.*, 405 So.2d 485, 487 (Fla.App.1981).